**MATHENY v. UNITED STATES FIDELITY & GUARANTY CO. et al.**

**SHOEMAKER et al. v. SAME.**

Nos. 5620, 5621.

Court of Appeal of Louisiana. Second Circuit.

April 1, 1938.

Rehearing Denied April 29, 1938.

Writ of Certiorari and Review Denied May 30, 1938.

**648**

Wilkinson, Lewis & Wilkinson and Barksdale, Bullock, Warren, Clark & Van Hook, all of Shreveport, and Robert F. Kennon, of Minden, for appellants.

George T. McSween and Foster, Hall, Barret & Smith, all of Shreveport, for appellees.

TALIAFERRO, Judge.

These consolidated suits in which damages for physical injuries, etc., are sought to be recovered, grew out of a collision in Bossier City, Louisiana, at the hour of one o'clock A. M., October 24, 1936, between a V-8 Ford sedan, driven by defendant, E. S. White, and a Ford coupe in which were traveling plaintiffs, Frank S. Matheny and Mrs. Grace C. Shoemaker, then being driven by the former. Dr. Harlan Shoemaker also sues to recover the amounts expended by him for medical, surgical, dental and hospital services rendered Mrs. Shoemaker, his wife, and for the cost of brace and special shoe; also for the estimated cost of plastic surgery to her face, an operation on the right knee and the additional estimated expense for dental surgery not yet performed.

The sedan was traveling westerly. The coupe was going easterly. The collision occurred on the convex side of a rather sharp easterly curve in U. S. highway No. 80, not over four blocks from the east end of the new traffic bridge which spans Red River.

Accompanying White in the sedan were S. R. Burroughs, W. D. Garner and H. M. Cone. All were residents of Mansfield, Louisiana, excepting Cone, whose home was in Houston, Texas.

The specific acts of carelessness and negligence alleged to have been the sole and proximate cause of the collision are: Operation of his car immediately prior to and at the time of the collision at an excessive and dangerous rate of speed, and in violation of the laws of Bossier City; that because of such speed, he did not have the car under such control as the physical conditions at and about the locus of the collision demanded, and for these reasons and causes, he crossed from his side of the highway into the path of the coupe and created conditions which resulted in and made inevitable the collision.

White was a salesman, employee of the Mansfield Motor Company, Incorporated, of Mansfield, Louisiana. The sedan was owned by that company. White and the company's public liability insurer, the United States Fidelity & Guaranty Company, were impleaded as defendants.

The theory upon which plaintiffs' suits are based and their hopes of recovery predicated is that White, at the time of the accident and from the time he left Mansfield the evening prior, was on a mission for his employer and was in the active discharge of his duties as salesman. They allege that the trip from Mansfield to Keithville, 25 miles north, was made by White under instructions from his employer for the purpose of calling upon two prospective buyers of automobiles at Keithville, Louisiana, and that he was also instructed to proceed from Keithville to Shreveport to see and study, as a part of his duties, the Ford automobile exhibit then being installed at the Louisiana State Fair Grounds; that at a place known as Kickapoo, which is a few miles south of the city of Shreveport and not far from the Fair Grounds, White contacted one H. M. Cone, who was interested in buying a car and who was known to White to be a prospective buyer; that Cone was then and there invited by White to ride in the sedan with him and he accepted the invitation and accompanied White to the Fair Grounds and continuously thereafter to the moment of the accident; that White was and had been prior to the accident endeavoring to sell Cone a car. It is further alleged, in substance, that after completing his observations and study of the Ford ex-

hibit at the Fair Grounds, White, accompanied by Burroughs and Cone, the prospective buyer, drove in said sedan to a sandwich stand in Bossier City to procure something to eat; that the meal was preparatory to the return to Mansfield and was a necessary incident to enable White to complete the business trip for his employer, and to then return to Mansfield with his employer's car that night so as to be present there the following morning to resume his work as salesman; that after completing said meal, the party in said car, with White driving, started back to Kickapoo and to Mansfield, for all of said related purposes, and that the collision occurred very soon after said return trip was begun.

The insurer and White severed in answering. The former admits issuance of the policy sued on to the Mansfield Motor Company and the accident, but denies liability of any character for the results. This denial is based upon the affirmative averments that White's use and operation of the sedan from the moment he left in it from Mansfield the evening of October 23rd to the time of the collision was not that of agent for the insured, and that on said trip he was not on a mission for it nor was he performing any duty of or incident to his employment; but, on the contrary, was on a personal pleasure trip wholly dissociated from his employer's business.

In the alternative, the insurer avers that if it be found as a fact that the collision was to any extent caused by White's negligence, Matheny was also negligent in that he was driving the coupe at an excessive rate of speed when the collision occurred and was then on the wrong side of the highway, etc.

White denies that his negligence or carelessness caused the accident. He admits that the trip from Mansfield to Keithville was for the purpose of calling upon two prospective buyers of automobiles, and that the trip and his actions in this respect were in the course and scope of his employment. He further avers that at Kickapoo he contacted Cone, also alleged to be a prospective car buyer, and that in furtherance of his desire and efforts to sell him a car, he accompanied Cone to the State Fair in Shreveport. He admits that the party drove from the Fair Grounds to Bossier City to procure something to eat, and after doing this, they started back to Mansfield to return the car and be present the following morning for duty.

The contributory negligence of Matheny, in the alternative, is pleaded (as by the insurer) in bar of recovery by either plaintiff. As against Mrs. Shoemaker's right to recover, and in the alternative, it is specially pleaded that the coupe was owned by her and that Matheny was operating it as her agent, and that his negligence in the respects above mentioned was her negligence, and therefore, she is as responsible therefor as he; that she had ample opportunity to see the highway ahead and to observe the careless manner in which Matheny was operating the car and negligently failed to protest against same or warn him of the danger, etc. Her negligence in these respects is declared to have been a proximate cause of the collision and sufficient in law to bar any recovery by her herein.

Judgments against both defendants, in solido, were awarded plaintiffs as follows:

Mrs. Shoemaker ............... $8,500.00
Dr. Shoemaker ................ 1,081.00
Matheny ...................... 2,673.00

No increase in these amounts is asked by plaintiffs. Defendant, the insurer, vigorously assails them as being excessive.

Liability of the insurer for damages resulting from the accident is not questioned should it be found and held that when the accident occurred White was performing a duty or duties, as agent or salesman for his principal (the insured), comprehended within the terms of his contract of employment.

As regards White's negligence as the sole cause of the collision, there is virtually no dispute. He evidently was unacquainted with the highway and did not observe the sharp curve ahead of him in time to negotiate it at the high rate of speed his car was then traveling. He drove heedlessly across the curve and collided with the Matheny car on its side of the highway.

It is the defendants' contention first, that the entire trip from Mansfield to Shreveport was a pleasure jaunt of all four parties, and at no time thereon was White performing any service to his employer; that the interview with Williams, the prospect, at Keithville was a mere incident of the trip. Alternatively they contend that after leaving Keithville, White's relation to the Mansfield Motor Company was simply that of bailee and that this relation would have

continued, at least, until he had returned with the car to Keithville.

White's duty was to sell Ford cars for his principal. He was paid a flat monthly salary. His ability as a salesman is conceded. There were no restrictions placed upon his activities in point of time. He was authorized to make contacts with prospective buyers when and where he chose (within territorial limitations), and to follow up these contacts in the manner and as often as his own good judgment dictated. Nightfall was no bar to his activities, although most sales were discussed and closed in daytime. Prospects whose business situation was such as to admit of no opportunity during the day to listen to salesmen or close trades, were sought out and approached at night or after office or business hours.

Amos Williams, who operated a business at Keithville, 25 miles north of Mansfield and 15 miles south of the city of Shreveport, was a prospect or potential purchaser of a Ford car from the Mansfield Motor Company. He was so listed and had been approached on the subject of buying several times by White. He had previously purchased a truck through him from this company.

■ At about seven-thirty P. M., October 23, 1936, Cone and Garner, in the former's car, left Mansfield to spend a few hours in Shreveport, and at about the same time White and Burroughs, an employee of the insured, also left Mansfield, primarily, we think, for White to interview Williams at Keithville in regard to buying a car. Our interpretation of the testimony touching the question convinces us that White and Burroughs did not definitely know when they left Mansfield that they, especially White, would continue the trip beyond Keithville. The testimony of Burroughs, White and Cone definitely supports this conclusion. It was White's idea originally to go see Williams and he invited Burroughs to accompany him. He did see Williams and endeavored to induce him to buy a car. On this subject, Cone testified that the reasons White assigned for not riding in Cone's car to Keithville were that he had to see someone about a car at that place and that "he suggested that we go on because they (White and Burroughs) might be detained and have to come back". We think the record supports the conclusion that whether White or Burroughs, especially White, would extend their journey

to Shreveport, depended upon the result of the interview with Williams. Should Williams buy a car, it was evidently in White's mind to deliver it to him that night, if he so desired. It was the understanding between the two parties originally that they would meet at Keithville. It was there that White and Burroughs definitely determined to go on to Shreveport. It was also decided there that the parties would again meet at Kickapoo. This was done. Cone and Garner left Cone's car there and entered White's, and the trip to the Fair Grounds was begun. They spent a few hours there "milling" about and seeing sights of interest, from whence they drove through the city of Shreveport, over the new traffic bridge into and beyond Bossier City. They next stopped at a night club, the name of which none could remember, and there ate sandwiches and drank beer. This particular club was visited at the suggestion of Garner who wished to make inquiries about a hat which he had left there a few nights prior. It was definitely understood when they left this club that they would proceed directly over the route they had followed, eliminating the Fair Grounds, to Kickapoo, where Cone and Garner would board the former's car; and from thence the two parties would return directly to Mansfield. Therefore, these findings of fact, coupled with the nature of White's duties and powers as a salesman, compel the further finding that at least the trip by him to Keithville was made in furtherance of his employer's business. It was a mission in the interest of the employer. While the employer had not specifically directed White to make this trip to see Williams, he had implied authority to do so. The situation is the same as though he had been specifically directed to so act. The lower court so found and we concur in the finding.

The allegation that White was directed by him employer to visit the Fair to inspect and study the Ford Motor Company exhibit there is wholly without support of any character. White did not see the exhibit, in fact, testified that he did not really know any such exhibit was there. His employer did not instruct him to make the trip to Shreveport or to look the exhibit over.

We are not impressed with the contention that Cone became a prospect for White at Keithville or Kickapoo, or at any other point after leaving the latter place. The two only met a few minutes before the par-

ties left Mansfield that evening. Cone had been in Mansfield only two days. He was installing a lubricating system for the Chevrolet agency of that city, of which Garner was service manager. It is probably true that during the evening White, in the hope of interesting Cone in the purchase of a Ford car, extolled its many virtues, but beyond this nothing was passed between them to indicate that these remarks were more than casual. White testified that he did not regard Cone as a prospect. However, this is in contradiction of the averments of his answer and is also in contradiction of an admission by him in the Matheny suit to the same effect.

We are also in accord with the conclusion of the lower court that after leaving Keithville, the character of the trip of White and Burroughs underwent a marked change; that from that time until the visit to the night club east of Bossier City, they were in the pursuit of personal pleasure and on a jaunt wholly without interest to their employer and from which no benefits could possibly accrue to it. Beginning at Keithville, there was a deviation or turning aside by White from the course of his employment. This continued certainly until his determination to head for Mansfield on leaving the night club. The question, therefore, arises for decision: Did White reenter the course and duties of his employment and reacquire the status of agent of his employer the moment he began the return journey? The lower court sustained the affirmative of the question.

The car White was driving belonged to his employer. He kept it in his possession night and day, and was authorized to employ it in his personal business and for pleasure. When so using it, he was obligated to pay for the fuel consumed. He, Burroughs and Garner were anxious to return to Mansfield in time to report for duty the following morning at 7:30 o'clock, or there about. It is the earnest contention of plaintiffs that in view of the obligation resting upon White to have the car in Mansfield for use in his employer's business the following morning, when the journey back to Mansfield began, White then and there reentered his master's employment, and that this relation would have prevailed for the entire trip back to Mansfield, had it not been interrupted by the accident.

Under the well settled jurisprudence of the state, if White had only gone a short distance, a mile or two from Keith-ville, on a personal mission, consuming an hour's time or thereabout, the moment he had completed or abandoned such mission and decided to return with the car to his employer's place in Mansfield or to his own home, the relation of master and servant would then and there have automatically been resumed and thereafter the doctrine of respondeat superior would have obtained as between them. Here, the servant went over 15 miles from the point where the master's business had been attended to and some five hours thereafter elapsed before it may be said that he reentered his employment. In point of time and distance, how far may the principle of reentry be extended or applied? In some jurisdictions it is the rule that the servant's reentry into the master's employment re-attaches only when he has again reached the zone of his employment, while others only require that he be reasonably near to such zone before the relation of master and servant again arises. Neither rule has been adopted by the courts of Louisiana, but the contrary has been established. In Glass v. Wise & McAlpin, 155 La. 477, 99 So. 409, on this subject, the court said (page 410):

"And, in order to constitute a re-entry upon the business of the master under such circumstances, it was not essential for the servant to have reached the zone of his employment or the territory in which he was employed to make deliveries."

The court in the course of its discussion of the question quoted the following paragraph from the Cusimano Case, Cusimano v. A. S. Spiess Sales Co., 153 La. 551, 96 So. 118:

"And the authorities hold that, when the servant, having completed the purpose for which he turned aside, is returning to resume his duties, he is, whilst so returning, engaged in the business of his master."

Justice Odom, in James v. J. S. Williams & Son, 177 La. 1033, 150 So. 9, copiously discusses the subject of reentry in cases of this character and cites and reviews many authorities from other jurisdictions wherein the question is dealt with. Concluding his remarks and as a summary on the subject, he says (page 13):

"The court, in the Glass Case, did not intend to enlarge the doctrine announced in the Cusimano Case, which is in line with the rule followed in the other states, and is that where a servant is sent out by the master on a mission pertaining to his business,

and, while out, the servant departs wholly from that mission and goes upon one of his own, the relationship of master and servant is temporarily suspended durng the performance of the servant's private mission; but when the servant turns and resumes the work which he was sent out to do, if that be nothing more than return the vehicle, he re-enters his master's employment, and the liability of the master for his torts reattaches."

In that case an effort was made to hold defendant responsible for the damages caused by its servant while on a private mission of his own in defendant's car, which was taken and then being used without defendant's knowledge or consent.

In the recent case of Parks v. Harvey Hall et al., 179 So. 868, on the docket of this court, we had occasion to and did elaborately treat this question. It was shown in that case that Hall, the servant of Gans, was authorized to have Gans' car washed and then return it to a designated place. Hall disobeyed instructions and gathered up four of his friends and drove them on a mission of his own some 7 miles beyond the place where the car was to have been washed. On their return trip the car was involved in an accident. Four suits were filed against Hall, Gans and the carrier of insurance on Gans' car. We held that Hall had not reentered his master's employ when the accident occurred because the testimony disclosed that his first destination was not to take the car to the wash-rack but to return his guests to their respective homes and thereafter to have the car washed. A rehearing was granted in the case only on the question of the construction of the omnibus clause in the policy of insurance. This question only was pressed in the application for a hearing. The case is now in the Supreme Court on a writ of review. 181 So. 191. Other cases bearing upon this question cited and relied on by appellees are: Black v. Railway Company, 125 La. 101, 105, 51 So. 82, 83, 26 L.R.A.,N.S., 166; Duffy v. Hickey, 151 La. 274, 91 So. 733; Bowles v. McGlasson, 5 La.App. 367; Embry v. Reserve Natural Gas Company, 12 La.App. 97, 124 So. 572; Krousel v. Thieme, 13 La.App. 680, 128 So. 670; Goldman v. Yellow Cab Company, 17 La.App. 450, 134 So. 351; Carriel v. Federal Compress Company, La.App., 147 So. 120; Gilbert v. Trotter, La.App., 160 So. 855.

Appellants cite authorities from other states in support of their position that when White entered upon the pleasure journey at Keithville, his relation to his master underwent a complete metamorphosis; that he then passed from the status of servant to that of bailee. This may be correct and if so such relation subsisted until, at least, it was definitely determined to return with the master's car to Mansfield and the journey, in furtherance of this determination, actually begun; but under the decisions above cited and quoted from, unless the elements of time and distance force a different conclusion, when the return trip began, White's status again underwent a definite change from that of bailee to that of servant.

In none of the many decisions dealing with these questions were the elements of time and distance near so much as in the present case. We have a conviction that there must be some limitation upon both elements, particularly that of distance, but we are not prepared to here lay down a definite rule regarding same. In the final analysis touching these factors, each case must be determined largely from its own peculiar facts. In the present case, we hold, as did the trial judge, that at the time the accident occurred, White had reentered his employer's service and that liability for the results of the accident devolved upon the insurer.

This leaves for determination the vexatious question of quantum. The lower court's findings as regards the nature, character and extent of the injuries suffered by Matheny and Mrs. Shoemaker are here quoted:

"Matheny sustained injury to his chest and knee and general shock, but no broken bones. He lost some time from his business and, of course, suffered a good deal of pain. I think $2,000.00 for his injuries, plus $500.00 for loss of time and living expenses at the hotel, and $173.00 for doctor and hospital bills will compensate him for the injuries he sustained.

"Mrs. Shoemaker suffered more serious injuries. The bones in her ankle were fractured, her knee was injured, she sustained a cut near her eye which has left a small scar; she has a rather large lump on the outside of her left leg, about half-way between the hip and knee; three teeth were so loosened that they had to be extracted, and the occlusion of the remaining teeth is not as good as before and the loss of the teeth interferes with her speech. She is apparently about 55 years old, nice looking

and well taken care of and apparently proud of her personal appearance, which is not as good as before the injury. Her ankle still gives her some trouble and swells noticeably on use. She is apparently worried about the lump on the left thigh. In discussing the case during the oral argument, I estimated that $7,500.00 would be about the right award for her. Further consideration of the case has convinced me that this would hardly be adequate, and I believe $8,500.00 would be nearer right. I would itemize it as follows:

Pain and suffering.............. $2,500.00
Injuries to knee and ankle....... 2,500.00
Disfigurement and permanent disability, including impairment of speech ..................... 3,500.00

Total ................... $8,500.00

"Mrs. Shoemaker is above the average for intelligence and education and says she had a fairly good income practicing applied psychology. She will feel more keenly her disabilities than a person of lesser intelligence, education and pride. Dr. Shoemaker should have judgment for the following sums:

Medical and hospital expenses... $ 724.00
Dental services already paid..... 15.00
Estimated cost of dental work to be done ..................... 300.00
Steel brace and shoe for right ankle ..................... 42.00

Total ................... $1,081.00

"It is not shown that an operation to the knee and leg will be of any particular benefit, and the claim for that will be rejected. I do not believe that any amount should be allowed for plastic surgery as claimed, and that demand will be rejected. The disfigurement to the face is not pronounced enough, in my opinion, to warrant plastic surgery."

The amount of the judgment in favor of Dr. Shoemaker is not attacked. The awards in favor of the other plaintiffs are seriously assailed.

We are in sympathetic accord with the feeling expressed by the Supreme Court in Brook v. Interurban Motor Transportation Company, 156 La. 286, 289, 100 So. 428, in which it said (page 429):

"That question always involves more or less embarrassment, as its solution rests in the sound discretion of judges and juries.

The only safe rule is to abide as much as possible by precedents."

We have reviewed the authorities cited by appellant and otherwise given due thought to the earnest and forceful pleading of its counsel as regards quantums. We are not convinced that the lower court, who saw and observed the injured plaintiffs as they appeared in court and testified, has awarded excessive damages to them; and therefore, for the reasons herein assigned, the judgments appealed from are hereby affirmed, with costs.