89 So.2d 405 (1956)
James D. BAKER
v.
UNITED STATES FIRE INSURANCE CO. and Floyd O. Holloway.
No. 4238.
Court of Appeal of Louisiana, First Circuit.
June 29, 1956.
Rehearing Denied September 24, 1956.
Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellant.
White & May, Baton Rouge, for appellee.
Huckabay, Seale, Kelton & Hayes, Baton Rouge, for intervenor.
ELLIS, Judge.
Plaintiff's automobile was struck from the rear by a truck which in turn had been struck from its rear by an automobile driven by the son of the defendant Holloway. As a result of the collision plaintiff suffered an injury to the muscles of his neck and back, commonly known as a "whip-lash" injury. He filed suit against Floyd O. Holloway and the insurer of the latter's automobile, in which he prayed for $25,000 damages.
The case was tried by a jury which awarded plaintiff the sum of $5,600. The defendants have appealed but are not questioning the liability but strenuously contend that the award was excessive and should be reduced to $1,500. On the other hand, the plaintiff has answered the appeal and asked that it be increased to $10,000.
The only question is one of quantum which, of course, depends upon the facts with regard to the nature and seriousness of plaintiff's injuries and disability as a result of the "whip-lash" injury.
The workmen's compensation insurer of plaintiff's employer intervened in this suit claiming reimbursement of $291.42 paid to plaintiff as compensation, and $341.89 paid for medical expenses. The intervenor appealed for the reason that the judgment below made no reference to the intervention. *406 Intervenor should have had a judgment as prayed for in the Lower Court and on this appeal is entitled to a judgment with recognition of its preference and priority to be paid out of any sum awarded to plaintiff.
The accident in which the plaintiff was injured occurred on June 17, 1954, at which time he was driving a Chrysler ambulance owned by his employer, Hollobough-Seale Funeral Home in the City of Baton Rouge. He testified that as soon as the car was struck in the rear he thought his neck had been broken. He says that he fainted immediately after the accident and did not remember anything until two city police officers came to his car. He would not consent to go to the hospital but the officers persuaded him that it was best to do so, however, he did complain at the time of the injury to his neck. He did not allow them to call an ambulance but drove himself to the hospital and asked for Dr. Reiger, but he was absent and he was seen by Dr. Brown, a partner of the first named doctor. X-rays were taken which revealed no bone displacement or injury. After going to the hospital he did not drive the Chrysler ambulance back to his employer's place of business but one of his co-employees came after him and took him to his home where he went to bed and took head treatments as prescribed by Dr. Brown with a lamp borrowed from his employer. He stayed home next day and called Dr. Campanello, an orthopedist of Baton Rouge, and saw him the following evening. He did not return to work until August 22, 1954, during which time he was paid full wages and, therefore, there is no claim for loss of earnings.
Dr. Campanello, upon examination, found the plaintiff suffering from a "whip-lash" injury. He stated that plaintiff had a tenderness over the right trapesis muscle and restriction of the neck in all directions, particularly in bending the neck backwards and rotating the neck to the left or to the right. He found no neurological changes and no evidences of any involvement of the shoulders. Dr. Campanello stated that the subjective complaints of the plaintiff at that time were commensurate with the type of injury that he stated he had suffered.
Dr. Campanello described the "whip-lash" injury of the neck as one which occurs when a car is stopped "and then being struck from the rear, the body is thrown against the back and the entire weight of the patient is thrown forwards, the neck backwards, and that, as a result, is a mechanical descriptive known as whiplash injury. The neck just goes backwards and forwards." Dr. Campanello stated on the trial which was heard Oct. 14, 1955, that the plaintiff had been under his care ever since the injury and had numerous treatments, in particular he was treated with a brace to prevent the neck from bending forward, and that was followed by the application of surgical traction including one hospitalization for traction, and plaintiff had numerous injections and spraying of the neck with ethyl chloride in an attempt to eliminate all of his pain, together with an oil medication to prevent dizzy spells and headaches. The ethyl chloride was to freeze the nerve. In addition to the above, the plaintiff was taking phenobarbital tablets for his headaches. The surgical traction which Dr. Campanello prescribed and that plaintiff used was known as the "head halter" and the patient gets flat on the bed and can apply the traction with about seven pounds on the head to pull on the neck. He was also instructed when sitting up to use a twenty pound pull which was necessary on account of the sitting position in order to pull the head up. Dr. Campanello testified that as far as he knew the plaintiff continued using traction at home and, further, that he had seen the plaintiff approximately 20 times. Under cross examination he testified specifically as to the following dates: 6/18/54; 7/22/54; 7/29/54; 8/20/54; 9/3/54; 10/1/54; 10/6/54; 12/28/54; 4/12/55; 5/12/55; Sept. 18, 19, 27 and 29, 1955. After enumerating these dates, counsel for defendant told the doctor, "That's enough." This doctor stated that the *407 "whip-lash" injury could be very mild and then it could be quite severe, and in his opinion the plaintiff had received "a pretty good jolt," although he did state that there was nothing out of the ordinary about plaintiff for this type of injury, and in testifying to the length of time it takes such an injury to clear up, he stated:
"It's a question of months and years and weeks."
He testified:
"* * * But what happened to this young man is simply two thingsthat when the body went forward and the head went back he pulled the muscles in the back. He will have tenderness all through here a long time. Then the next step was that as the head went forward it pulled these big muscles that we call the trapezia muscles and he has been having tenderness over that area. And because of his persistent headaches and dizzy spells he also had what we call tracular neuritis from these little nerves that come up from the back. Those were the three things that happened to this young man."
Dr. Campanello further stated that plaintiff's muscles were strained and that necessarily means a tearing which would of necessity include bleeding, neither of which would show up on an x-ray. He last saw the plaintiff on September 29, 1955, prior to the trial on Oct. 14, 1955, and had been treating him since June 18, 1954, and he testified on the trial that he still found the plaintiff ailing the last time he came to see him, which he thought was not abnormal for the type of injury that the plaintiff had suffered. He was positively of the opinion that the pain and headaches which the plaintiff complained of were genuine. Dr. Campanello on cross examination said that the plaintiff had been able to continue with his occupation as employee of the Hollobaugh-Seale Funeral Home but "with some difficulty, he says, particularly when he tries to look up and turn his neck but all in all he says he has been able to do it." He further stated under cross examination that in these cases for a simple pull of the muscle, which is without any scar tissue, about six weeks should be sufficient for the patient to recover. From his testimony, he was of the opinion that the plaintiff's strain or whiplash was severe and he evidently found nothing unusual in the duration of plaintiff's disability and complaints. He attributed the severity of the plaintiff's injury to "tears and bleeding in the muscles", which would cause scar tissue and this results in pain sometimes. In conclusion Dr. Campanello stated that the plaintiff had 15% permanent disability in the neck and by this he stated: "It takes into consideration all of the disabilitythe headaches, the dizzy spells, the lateral motion and the up and down."
Dr. Campanello was subjected to vigorous cross examination and in answer to question by counsel for defendant as to what evidence he had that there was any tearing of any of the muscles in plaintiff's neck at the time this accident happened stated:
"A. At the time that the accident happened Mr. Baker was unable to move the neck in any direction. It was quite stiff and tender throughout. That, to me, was an indication that serious damage had been done. And the fact that he had localized tenderness of the front of the neck and to the back will indicate at least a painful area in which there had been some bleeding.
And again:
"Q. And there was no evidence that you could put your hand on exceptor put your finger onexcept the stiffness which would indicate to you that anything happened inside his neck other than a mild strain? A. Yes, at the time, I should say that's correct.
"Q. The only thing that you now have that you didn't have at the time *408 you first saw Mr. Baker is that he still complains of his neck; is that right? A. He still complains of his neck and he still has limitation of motion and he still has the headaches."
And again on cross examination:
"Q. Would you describe the objective points again in your examination?
"Objection by Mr. White: If your Honor pleases, I wish to object to any repetition. This trial, I think, has been delayed long enough.
"The Court: Objection overruled. Go ahead.
"A. We said that he complains of pain, of course. That's a subjective pain. That's what the patient tells me. But when he tells me that he has pain in a certain area and then I can pinpoint that area just like I did over the superscapular nerve and block that nerve for him and then he tells me, `Well, that feels better; I don't feel it anymore' that's convincing enough that the man is not telling a story. And that, therefore, would be an objective findingthe tenderness, particularly after the tenderness has been deadened and frozen and the pain disappears, that is objective. The other objective finding mentioned was the fact that when you pressed on his trapezial muscle bilaterally particularly over the, what we call the superscapular notch, and that's tender, then that's objective. And then, when trying to twist his neck to the left and to the right and when he turns to the left then there is pain produced on the right side and there is spasm and tightness of that musclethat is objective. And then when he turns to the right and his pain and tenderness is produced to the opposite muscle on the left, then again it's objective. And on attempting to bend the neck backwards and the patient tells you that he has tenderness right over the spine and that spine is marked and you come back later and you repeat the test and then he tells you that he's still got the pain over that areathat's objective."
City Officer Ballard who investigated the collision stated that when he arrived Baker had his head resting on the back of the seat with his hands clasped behind his neck and that he opened the door and asked if he was hurt and plaintiff told him: "* * * he thought his neck was hurt." The testimony shows from the beginning that immediately after the accident plaintiff complained of his neck and there is no dispute as to the fact that he did suffer a whiplash injury. The Chrysler ambulance was evidently struck fairly hard as the plaintiff testified the right rear bumper guard was knocked off of the car and it was leaning on the right side, presumably as the result of the fact that the right rear spring was broken, and, in addition, the brace that held the bumper on to the car was bent. There is no other testimony with regard to the condition of the car.
Plaintiff testified in his own behalf that while he had returned to his work on August 22, 1954, he had done so because he had to and by way of explanation he testified:
"* * * Workmen's compensation pays you $30.00 a week. I'm not a rich man. I have a wife and child to support. And I went back to work with the understanding with my employers that the condition that I was in that I could come back at my regular salary and them understand the situation.
"Q. I may be wrong about this, Mr. Baker, but didn't you draw full wages whileat all times after the accident? A. Yes, sir, I did.
"Q. And you never did have to live on $30 a week, did you, Mr. Baker? A. No, sir, but I would have. There's *409 a time limit in our program at the funeral home on workmen's compensation on a man injured."
Plaintiff in effect testified that he had done the work expected of him by his employer but that he had had some discomfort doing it. He further stated that he took phenobarbital and put ice caps on his head just prior to the trial date, and that when he had a very hard day at the office with a great amount of lifting, he could count on a headache, and if he walked any distance headaches came on. Further, that sitting up straight on a chair or in one position for a long period of time caused them but that at the funeral home he could lie down when he felt bad.
Curtis Cavaliero, a co-employee of plaintiff at the funeral home, stated that the plaintiff did suffer headaches and dizzy spells while "working in the preparation room over a body bending down," and that they were quite frequent, and that he had also helped or assisted plaintiff in doing his work. He testified that on one occasion plaintiff had blacked out and called the funeral home and asked someone to come pick him up. Another co-employee, Hastings D. Shipp, testified that plaintiff complained with his neck and on occasions he would see him rubbing it, and also, in lifting, plaintiff's neck seemed to bother him. He further stated that plaintiff still had complaints up to the date of the trial on October 14, 1955, although he had never heard the plaintiff complain prior to the accident about headaches or stiffness in his neck. This witness on cross examination testified that a fair statement of his testimony would be that since plaintiff's return following the accident that he had been able to do the work satisfactorily although he complained occasionally of headaches and pains in the neck.
Dr. Joseph M. Edelman of Baton Rouge, a neurologist, examined plaintiff on August 29, 1955 and testified on behalf of the defendant as follows:
"* * * The patient had full and complete range of motion in his neck in all movements. That is, he had it in flexion, extension, lateral rotation in either direction, and lateral bending in either direction. He had no spasm of the muscles in the neck, what we call cervical muscles, and he had no tenderness over the cervical spine. A complete neurological examination was conducted in which an examination of this patient's cranial nerve, those nerves associated with the skull, was carried out. All of these findings were normal. His neurological examination also included examination of the cerebella system which has to do with balance and coordination and all movements which were required of him could be done with ease by the patient. His muscular system was also examined and there was no evidence of any atrophy or wasting or shrinking of any of the muscle groups either of the neck, the muscles of his shoulders, the muscles of his arms, forearms, the muscles of the hands, and the similar was true of the muscles of the lower portions of his body as well. His reflexes were checked and these were found to be equal and active, and there was no abnormality of any of the reflexes. Examination of his appreciation of sensation was checked. I checked him for ability to feel light touch, to feel painful stimulation such as with a sharp pin. The sensations associated with position and vibration, which are part of the neurological examination, were checked, and they showed no abnormalities. In addition, X-rays of this patient's neck were taken by Dr. David S. Malen. I obtained these films which were taken on the 29th of August, the day of the examination. These films were examined by me and I found that there was no evidence of any abnormality on these pictures. There was no evidence of any spasm of *410 the neck muscles which is indicated on the x-ray by changes in the shape of the curve of the cervical spine. There was no evidence of any fracture. There was no evidence of any dislocation, All in all, the pictures were completely normal.
"Q. Doctor, what conclusions did you reach as a result of your examination? A. I found that this patient had no evidence of disability whatsoever, as a result of his accident of June, 1954. He certainly had no evidence of any involvement of his spinal cord, nerve roots, or any part of his nervous system as a result of his injury.
"Q. Did you find any objective symptom of any kind which would tend to corroborate the complaints which the patient had? A. I found none.
"Q. If in fact, Mr. Baker had sustained an injury which could be the source of complaints this long after the accident he described to you, would you as an expert in your field expect to find some objective sign or some positive reaction to some of the tests which you gave him which could demonstrate proof that such complaints were valid? A. I found no objective signs of any sort in this patient to suggest that he had any residual from this injury or any damage, residual damage from this injury."
He further stated that ordinarily patients who have a neck strain should be over their symptoms in four to six weeks although occasionally patients do have persistence of symptoms at most of three to four months. He stated that he had been impressed with the fact that those who had litigation "seem to always have persistence of symptoms over a longer period of time than those patients with which there is not that problem." In other words, Dr. Edelman's testimony was as strongly opposed to the fact that plaintiff had any residual injury from his accident on the date of the trial as Dr. Campanello was that he did have. Both doctors give reasons for their opinions.
Floyd O. Holloway, one of the defendants herein, testified that the day after the accident he had called the Funeral home in order to get in touch with the plaintiff and was told that he was out on a call, and he left word for plaintiff to call him when he came in, which he stated the plaintiff did.
Counsel for defendant cites the case of Wainwright v. Globe Indemnity Co., La. App.2nd, 1954, 75 So.2d 554, 556, in which the Court stated:
"It is also well recognized that awards made in similar cases are to be considered by the courts so that within the limits permitted by particular states of facts a degree of uniformity will be maintained, so far as possible and practicable, to the end that awards will not be out of all proportion one with the other. Cavicchi v. Gaiety Amusement Co., Inc., La.App., 173 So. 458; Matheny v. United States Fidelity & Guaranty Co., La.App., 181 So. 647; Hare v. New Amsterdam Casualty Co., La.App., 1 So.2d 439; Grissom v. Heard, supra [La.App., 47 So.2d 108]."
In addition, for the purpose of arriving at the quantum to be awarded in this case, he cites:
Edmonson v. West, La.App.1st, 1949, 40 So.2d 527, which dealt with a whiplash injury, and as in the case under consideration, the plaintiff did not miss any work, took diathermy treatments and massage from his attending physician, and several expert orthopedic surgeons who examined him found residual injury from the neck sprain nearly a year after the accident, and even subsequent to that date the plaintiff continued to complain of pain and discomfort, and an award of $1,000 for plaintiff's *411 pain, suffering and disability was affirmed;
Taylor v. Fidelity & Casualty Co. of New York, La.App.2nd, 1951, 55 So.2d 307, in which he argues that it is comparable insofar as the injuries are concerned in that the attending physician found a moderate cardiac contusion, contusion of the chest wall, contusion and possible strain of the left wrist and right thigh, and a possible ruptured intervertebral disc of apparently a temporary nature. The plaintiff was unable to work for a period of two months and had pain thereafter, continuing up to the time of the trial some seven months after the accident with no evidence of permanent injury, and he was awarded $1,500 for his pain, suffering and disability;
Ferro v. Carter, La.App.Orleans, 1952, 59 So.2d 163, 166, involving a whiplash injury of the neck in which the plaintiff had extensive pain and muscle spasm of the cervical muscles, and in the lumbodorsal muscles lower in the back; also, plaintiff was under medical treatment for over a year and a half which was intermittent and primarily for the purpose of observation and supervision, and the court concluded that "plaintiff sustained a rather severe jolt to his back and neck and that for several months at least he was in pain and could not perform his usual duties in his business", and he was awarded $1,500 for his pain and suffering.
Watts v. McCullom, La.App.1st, 1953, 64 So.2d 496, 498, in which the court found that plaintiff had sustained only minor and temporary injuries and reduced the award from $750 to $250;
Thibodaux v. Willet, La.App.1st, 1954, 70 So.2d 728, involved a back injury to a house wife who was in an automobile accident, and the court awarded her $750 for pain, suffering and disability;
Gay v. United States Fidelity & Guaranty Co., La.App.2nd, 1954, 76 So.2d 60, in which the plaintiff was injured in an automobile accident, sustained a lumbosacral strain, a broken right hand, cuts, bruises and lacerations of the back and the side of the head and face, and occipital neuritis and injury to his knees, and was required to wear a back brace for several weeks; the medical testimony indicated that he was still disabled four months after the accident and would require an additional period of six to eight months for his recovery. He was awarded $1,750;
Mansfield v. Toye Bros. Yellow Cab Co., La.App.Orleans 1955, 78 So.2d 544, in which the court awarded plaintiff $1,000 where the evidence revealed that she sustained a sacroiliac sprain, shock to her nervous system, contusions of the scalp, neck, knees and ankle, and was incapacitated for several weeks while receiving medical treatment;
Attaya v. Zimmerle, La.App.1st, 1955, 83 So.2d 676, decided by this Court which involved a whiplash injury. In this case a jury awarded plaintiff $7,500, and this court reduced the amount for personal injuries to the sum of $2,500. It was shown that plaintiff was treated by Dr. Gaudin from March 6, 1954, through April 22, 1954, and he testified that she had received a strain of the neck muscles with no showing of any injuries to the bone. Also the plaintiff had complained of pain in the neck, headaches and limitation of movements of the head. On April 24, 1955, plaintiff saw Dr. Bannerman, an orthopedic surgeon, who treated her until July 6, 1955 and he found that she had received a whiplash injury with complaints of tenderness particularly on the right side of her neck in the musculature with no tenderness over the neck bones. This doctor again examined plaintiff two days before the trial and she was still complaining of being intermittently bothered and particularly when she remained in the same position for some length of time, and it was necessary for her to take aspirin for relief. At this time there was a slight restriction of motion and he found her case was mild to moderate, no permanent injuries and no *412 evidence of nerve pressure, and it was his opinion that the whiplash type of injury usually cleared up within a few months but it was not unusual for them to last a year or a year and a half; but that Miss Attaya's injury was more prolonged than would ordinarily be expected. Dr. Foreman examined the plaintiff on March 21, 1955 and again on June 21, 1955. On the first examination he found tenderness to pressure over the left side of the back of her neck and along the base of the skull on the left side and down over the muscles at the top of the left shoulder, extending into the neck, and plaintiff had a slight limitation of the neck in certain directions with flexion forward most limited, and moderate limitation of lateral tilting of the neck and rotation of her head, all of which movements in the extreme ranges caused her discomfort at the back of her neck on the left side. The finding on the second examination, which was approximately 15 months after the injury, was essentially the same as the first. He found no evidence of damages to the nerve or nerve roots, and that plaintiff's headaches were less frequent and less severe, and that she had received a moderately severe whiplash injury. All the doctors stated that there were no permanent injuries and they were not considered severe.
In that case [83 So.2d 678] this court commented upon the Edmonson v. West case, supra, in which plaintiff was awarded $1,000, as follows: "We now feel that the amount awarded in the Edmonson case was too small taking into consideration the value of the American dollar, the seriousness of a whip-lash injury and the duration of the pain and discomfort as a result thereof."
In the case under consideration, the jury evidence accepted as true the testimony of the plaintiff, his fellow employees, and that of Dr. Campanello. Based upon such a finding of fact or accepting this testimony, the injuries suffered by the plaintiff in this case were more serious than those suffered by Miss Attaya in that plaintiff was off from work for practically two months, in the hospital in traction for one week and used traction at home under orders of the doctor, and according to Dr. Campanello, he has suffered a 15% permanent disability. There is clearly no manifest error in the Jury basing the quantum award in this case upon its acceptance of the testimony of plaintiff, his fellow employees and Dr. Campanello.
We realize that awards in similar cases with similar facts should be uniform so that they will not be out of proportion, one with the other, however, this does not mean that each whiplash injury, merely because it falls in that classification, should be more or less the same. As shown by medical testimony, they may be mild or severe, they may be of short duration or long duration, either temporary or permanent disability.
It is evident that the jury based its award upon the testimony of the plaintiff and witnesses who testified on his behalf, the most important being Dr. Campanello. Defendant filed a motion for new trial which was grounded on the alleged "excessive" award. The District Judge who heard the case refused this motion which was, in effect, an approval of the award. After a careful consideration of the testimony we cannot say that the award was manifestly erroneous.
The intervenor was entitled to be paid the sum of $633.31 in preference and priority from the total award.
For the reasons assigned the judgment below is amended by ordering the intervenor paid by preference and priority the amount of $633.31 out of the total award, and as thus amended the judgment is affirmed, costs of this appeal to be borne by defendant-appellant.