97 So.2d 82 (1957)
Mrs. Lilly Mae AYO, Wife of George F. BARTHOLOMAUS and George F. Bartholomaus,
v.
H. G. HILL STORES, Inc.
No. 20897.
Court of Appeal of Louisiana, Orleans.
June 24, 1957.
Rehearing Denied October 10, 1957.
Writ of Certiorari Denied February 10, 1958.
*83 Wilmer Glauner Hinrichs, New Orleans, for plaintiffs and appellees.
Adams & Reese, New Orleans, for defendant and appellant.
McBRIDE, Judge.
This appeal presents for review a judgment rendered in favor of plaintiffs in their suit for damages growing out of a collision between two automobiles, one a 1947 Studebaker passenger car and the other a 1941 Ford truck, the accident having occurred in the intersection formed by the downtown traffic roadway of South Broad Street and the outbound traffic roadway on Tulane Avenue a few minutes after noon on November 27, 1954. South Broad Street and Tulane Avenue intersect each other at a right angle and each has two traffic driveways separated by a neutral ground. A semaphore signal light at the corner controls the movement of traffic
Alleging that the accident was caused by virtue of the negligence of the truck driver, one of the charges being that he attempted to cross the intersection on a red traffic light, this suit is brought by plaintiffs against the owner of the truck for damages. Mrs. Bartholomaus claims some $30,000 for her personal injuries allegedly sustained and her husband seeks recovery of nearly $37,000 for his damages, to-wit: the cost of repairs to his automobile, physicians' fees and medical expenses, loss of earnings of his wife, loss of her future earning power, and the cost of employing domestic help during his wife's incapacity. The defendant denies that its employee was negligent and alleges, in the alternative, that Mrs. Bartholomaus was guilty of contributory negligence in several particulars, one of which is that she failed to keep a proper lookout ahead.
Mrs. Bartholomaus recovered judgment for $6,000 and her husband was awarded $490.57, and defendant appealed. Appellees answered the appeal praying for an increase in the awards.
Mrs. Bartholomaus was driving her husband's Studebaker automobile out Tulane Avenue in the general direction of the lake, and the Ford truck, owned by the defendant, H. G. Hill Stores, Inc., was being driven by its servant, Jackson, during the scope and course of his employment, on South Broad Street in a downtown direction. The vehicles came into collision in the aforementioned intersection, and a disagreement exists as to whether the Studebaker car struck the truck or vice versa. The weight of the evidence shows that the left front portion of the Studebaker hit the truck on its right side just to the rear of the cab and became wedged underneath the *84 body of the truck. After all, it makes no difference which vehicle struck the other, for the pivotal questions in the case are whether the truck was negligently driven into the intersection in the face of a red light and, alternatively, whether Mrs. Bartholomaus was guilty of contributory negligence in failing to observe the truck crossing Tulane Avenue.
There is no dispute that when defendant's truck reached the opposite or inbound traffic roadway of Tulane Avenue a red light confronted the driver, and it is also undisputed that he stopped in obedience to that unfavorable light. An automobile driven by a Mrs. Oxmann, in which a Mrs. Barbier was riding, was in the same traffic lane as the truck and Mrs. Oxmann stopped her vehicle to the rear of the truck. Both ladies say that the truck suddenly started off while the light was still showing red, crossed the inbound roadway of Tulane Avenue, the neutral ground, and then entered the outbound roadway of Tulane Avenue and collided with the Studebaker. Mrs. Barbier mentioned that other cars were stopped for the same red light but that none of these cars moved forward; she claims the truck made only a momentary stop before the ill-timed movement out into the intersection was undertaken. Mrs. Oxmann could not say for how long a period the truck had been stopped, but she states that when it moved forward she thought the light had changed to green, so she also started her car forward, and then noticing that the light was still red, she stopped and assumed the position that the truck had been in. The truck, according to Mrs. Oxmann, had attained a speed of from 25 to 30 miles per hour at the time of the collision.
Mrs. Bartholomaus testified she was proceeding out Tulane Avenue at a rate of speed of 25 miles per hour, which she reduced to 15 or 20 miles per hour on nearing Broad Street, her explanation for this reduction in speed being that she wanted to have her car under control in the event the green light which showed in her direction should change before she reached Broad Street. She states that her car was moving in the middle traffic lane and there were no vehicles in front of her or to her left or right; that the light was still green when she was about two carlengths before reaching Broad Street. She maintains that at this point she looked toward the left and noticed automobiles stopped on the far side of Broad Street at the inbound roadway of Tulane Avenue, but there were no vehicles in the intersection. She then proceeded to make the crossing when the defendant's truck suddenly came across the neutral ground and loomed up to her left. She swerved toward the right in attempting to avoid a crash with the truck, but this maneuver on her part proved all in vain.
This testimony of Mrs. Bartholomaus coincides almost perfectly with the statements of the two ladies who were in the automobile which had been following the truck. They were emphatic that the truck made its crossing of the intersection on a red light and that the Bartholomaus automobile reached the intersection just as the truck was clearing the neutral ground.
On the other hand, the truck driver, Jackson, and his helper, Griffin, claim that the light was green when they started across the intersection. Jackson went on to say that when his truck reached the neutral ground, he realized the dangerous potentialities of the situation and attempted to warn other vehicles, which he says were following the truck, by extending his hand out of the cab. Jackson and Griffin declared, also, that there were other automobiles on Tulane Avenue facing the same direction in which Mrs. Bartholomaus was traveling, but that these other cars were stopped because of a red light. They claim that Mrs. Bartholomaus was driving in the extreme right-hand lane and passed the stopped cars.
In contending that Jackson did not start out into the intersection on an unfavorable light, counsel for defendant argue that *85 whereas Jackson was an experienced and prudent driver who had been employed by defendant for many years, it would be unreasonable to assume or suppose that after stopping for a red light, he would then, before the light changed, start forward on the very same red light. All we can say in answer is that perhaps Jackson is as good a chauffeur as counsel say he is, but two reputable witnesses testified that he did attempt the negotiation of the intersection notwithstanding that a red light was facing him. Counsel also advance the argument that it would have been impossible for the thirteen-year-old truck to have attained such a speed as 25 to 30 miles an hour in so short a distance, and in that connection our attention is called to Jackson's testimony to the effect that he made a test of the vehicle and determined that after starting it from a stationary position, the truck could only be accelerated to a maximum speed of about 8 miles per hour within a distance of 80 feet. However, Jackson's experiment was conducted long after the happening of the accident, but at any rate here again we must say that a reputable witness stated that the truck did attain such a speed and we are unwilling to say that the witness was telling an untruth.
We have accorded especial attention to the testimony of Mrs. Bartholomaus, and except for one thing no discrepancies or inconsistencies appear therein. It is true that Mrs. Bartholomaus did state in her deposition on discovery that there were streetcar tracks on Tulane Avenue and further that she saw a streetcar pass behind defendant's truck as it cleared the neutral ground. In truth and in fact there were no car tracks on Tulane Avenue on the date of the accident, and, of course, Mrs. Bartholomaus' statement as to the passing streetcar is indeed odd and she made no explanation as to why she so testified. The evidence shows that the New Orleans Public Service, Inc., had removed its streetcar tracks from Tulane Avenue some four years before the date the accident happened. However, even taking all this into consideration, we do not think that Mrs. Bartholomaus should be branded as a perjured witness or that her other statements, i.e., as to the events leading up to the accident, should be disregarded in view of the fact she is fully corroborated by two witnesses whose veracity cannot be successfully challenged.
It is quite evident that the statements of Jackson and Griffin made no impression on the trial judge and they make none on us. The judge believed Mrs. Bartholomaus and her two witnesses, and in his reasons for judgment is found the observation that "the court is of the opinion that the evidence preponderates to the effect that the truck crossed on the red light." We have carefully sifted the testimony of the plaintiff witnesses as to the truck driver's behavior, and we can see no reason whatever for disagreeing with our brother below in his finding that Jackson negligently attempted to cross the intersection in the teeth of a red light, and we concur therein.
This leaves for consideration and discussion the alternative defense that Mrs. Bartholomaus was guilty of negligence contributing to the accident in not having kept a proper lookout and in failing to observe the truck as it was crossing Tulane Avenue.
Counsel contend that in any event a prudent driver situated as was Mrs. Bartholomaus should have seen the truck crossing Tulane Avenue. It is pointed out that the intersection is wide open and without the slightest obstruction to a motorist's view and we agree that such is the condition there. It is also pointed out that the truck was painted red and obviously could have been very readily seen had Mrs. Bartholomaus been attentive. Counsel seek to impress upon us that even if it be accepted as a fact that the truck crossed on the red light, there was no reason why Mrs. Bartholomaus should not have seen it and, therefore, she was guilty of the contributory *86 negligence charged against her. We agree with counsel that it is not to be disputed that a motorist who recklessly and without exercising some degree of caution drives into the intersecting street on a favorable light is not to be held blameless if he collides with another vehicle which enters an intersection on an unfavorable light. We also agree that the jurisprudence is to the effect that a motorist cannot in the face of imminent danger rely on the right of way accorded him by a favorable light, but as stated in Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292-294:
"* * * it also can not be disputed that under the traffic light system a motorist, who is proceeding on a proper signal, should not be held to the same degree of care and vigilance as if no such system prevailed. He has the right to assume that the signals are understood and will be observed and he is not required to anticipate that pedestrians or other motorists will, in violation of law, enter a crossing on a wrong signal. The danger at such crossing is less than if there were no such signals and therefore less care is exacted. * * *"
The Kientz case, which was decided by us, was reviewed on writs by the Supreme Court which reversed our judgment. In that case, defendant's driver was proceeding on a favorable light and had entered the intersection after looking and seeing no approaching vehicles on the intersecting roadway. He did not look again before negotiating the crossing and his vehicle collided with another which had entered the intersection. The contention was made that he was guilty of negligence in not seeing the approaching automobile, but the Supreme Court held that the defendant's driver was not negligent as he was not bound to look again as he was traveling on a green light and was not under the duty of anticipating that another vehicle from the intersecting roadway would attempt a crossing. The Court quoted what Judge McCaleb, then a member of this court, had written in dissenting from our majority opinion in the case:
"* * * `We are living in an advanced stage of the motor age. Heavy and congested vehicular traffic on the streets and highways is a daily rule rather than an exception. In these circumstances, it is vital to the public interest that the traffic rules and regulations be adhered to strictly (particularly with reference to the traffic semaphore system) as the motorist is, to a large extent, compelled to operate his car in the belief that the law will be obeyed by others. Hence, in gauging the fault which is attributed to one, who was operating his car in obedience to positive law, the courts should be convinced that the dereliction was most substantial and that it was such a direct factor that, without it, the accident would not have occurred.'"
Thus Mrs. Bartholomaus, proceeding on a favorable light, after looking to the left when about to enter Broad Street and seeing no vehicles approaching, drove into the intersection. She was not required either to look again to her left or to anticipate or foresee that Jackson would come into the intersection in the face of the red light. She was in the precise position as the defendant's driver in the Kientz case and must be held free of negligence.
Mrs. Bartholomaus was taken to the Charity Hospital for first aid treatment and remained there about three hours. Her injuries may be placed in three general classifications, to-wit: bruises and contusions, a whiplash injury to the cervical spine, and a sequela of occipital nerve neuralgia. She was treated by her private physician, Dr. James T. Nix, and was examined by Dr. Samuel A. Romano, on behalf of defendant, on January 3, 1955; she was also examined by Dr. James L. Lenoir at the behest of her own attorney on May 27, 1956, while the trial was in progress.
*87 The bruises and contusions healed without incident, and it appears that the whiplash injury and the nerve neuralgia caused the patient considerable suffering and mental anguish. We understand that "whiplash injury" is in reality a layman's term used with reference to neck injuries; the term is descriptive of the mechanism causing the injury and is not the pathological term. The injury is sustained as a result of a sudden unanticipated flexion and then hyper-extension of the neck. A whiplash injury may result in several types of pathological findings, such as sprain, fracture, dislocation and so forth. The consensus of the medical testimony is that the plaintiff sustained a sprain type of injury. The physicians differed as to the recovery time for such injuries and their estimates range from a few weeks to as high as eighteen months.
Dr. Nix, who is a general surgeon, testified that he treated Mrs. Bartholomaus on about fifty visits, since November 29, 1954, his treatment consisting primarily of diathermy and traction applied in his office during the first weeks and thereafter at the patient's home. It also appears that violet ray and traction treatments were administered to plaintiff by her husband and some were also self-administered.
It also appears that Mrs. Bartholomaus at first had her back strapped with tape for several weeks, and then was required to wear a lumbosacral support for several months and has worn it for symtomatic relief from pain in the lumbosacral region as late as August of 1955. Three types of cervical collars also were prescribed and worn by her almost continuously, except when eating or while in bed. Dr. Nix identified these as a felt collar, a foam rubber collar, and a steel frame cervical brace.
Dr. Nix on his last examination found that the only evidence of a residue of the sprained neck was muscle spasm, and he considered plaintiff to have about a one-tenth residual condition with sporadic pain from the lumbosacral strain.
Dr. Romano, also a general surgeon, states that his examination disclosed that the patient had made satisfactory recovery but he admitted she was likely to have symptoms related to the back. He thought Mrs. Bartholomaus had practically recovered from the neck injuries and there was no residual.
Dr. Lenoir was the only orthopedic surgeon to examine Mrs. Bartholomaus and all he found was the presence of muscle spasm to a slight degree which he attributed to the wearing of the neck brace rather than to any residual from the injuries. He could see no evidence of a dislocation, and that while active motion in the neck was restricted about fifty percent, recovery should take place in from nine to eighteen months. He emphasized the fact that the complaints of Mrs. Bartholomaus are out of proportion to his physical findings, or, in other words, her complaints are magnified. There was no evidence to warrant immobilization of the neck, and he believed it would be beneficial to her condition if Mrs. Bartholomaus would make some attempt to use the neck.
We believe that the testimony of Dr. Lenoir should be accorded great weight for two reasons: first, he was called upon to examine Mrs. Bartholomaus by her own attorney and, second, he was the only orthopedic specialist to examine the patient.
We do not think that there are any permanent injuries and the discomfort which Mrs. Bartholomaus was experiencing at the time the case was tried in the lower court should disappear in a reasonable time. She was allowed $6,000 for her injuries and we believe that such award does substantial justice in the matter. In Attaya v. Zimmerle, La.App., 83 So.2d 676, the plaintiff was awarded $2,500 for an injury to the neck similar to that sustained by Mrs. Bartholomaus, but it is clear from the medical testimony the claimant in the *88 instant case was injured more severely than the plaintiff in the cited case.
George F. Bartholomaus was awarded a judgment for $490.57, and our calculation shows that this includes $156.33 for the damages sustained by his Studebaker automobile in the accident, $292.24 representing medical expenses in connection with his wife's injuries, and the sum of $42 which he expended for domestic help during his wife's incapacity. There is no basis for increasing the amount.
The trial court refused to allow a recovery for the loss of Mrs. Bartholomaus' earnings or impairment of her future earning capacity and we see no error in such refusal. Mrs. Bartholomaus is a beauty operator and the record makes it abundantly clear that she was in no manner regularly employed. She did not work at all during the first part of 1954 because her husband had been assigned to a government position in Alaska. She worked thereafter only for a comparatively short period of time quitting her job in September. She claims during the years 1950, 1951 and 1952 she was self-employed, but it was not shown what her earnings were, if any, during those years and she could not submit copies of her income tax returns. In addition to all of this, Dr. Lenoir, the orthopedic surgeon, testified that there was no reason he could see why she could not perform the duties of a beauty operator. Under these circumstances, to fix any loss of wages would require that we delve into the realm of conjecture and speculation which we are unwilling to do. Dr. Lenoir makes it certain that Mrs. Bartholomaus' future earning capacity has not in the least been impaired.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.