ELLIS, Judge.
On June 18, 1955, slightly past midnight, James H. Simmons had brought his 1947 Chrysler automobile to a complete stop, in obediance to a red traffic light signal for southbound traffic on North Twenty-first Street. While so stopped Robert B. Pierce, also traveling south and admittedly asleep, crashed into the rear of the Simmons’ automobile at an estimated speed of from 40 to 45 miles per hour. The Simmons automobile was knocked approximately 85 feet and the Pierce Ford travelled approximately 111 feet from the point of impact. The frame and rear end damage to the Chrysler was so extensive that it was a total loss.
In the car on the front seat with Simmons was his wife, and in the rear were other passengers who were uninjured and whose testimony was unnecessary as liability was admitted.
Plaintiff, James H. Simmons, alleged in his petition that he had sustained the following injuries to-wit:
1. Bruises about the ribs and cartilages bilaterally from the sixth to tenth inclusive.
2. Bruises about the sternum.
3. Whiplash injury to the spine involving the lower cervical centering around C-6 and the lower thoracic around L-4 moderate.
4. Contusions about the left lower leg.
5. Trauma to the head and neck.
6. Severe concussion of head.
7. Shock and emotional upset.
In addition plaintiff, James H. Simmons, alleged and prayed for the value of his 1947 Chrysler automobile, and he also sought special damages in the sum of $240 *260 for loss of wages and for medical expenses and all costs.
Plaintiff, Mrs. Edna Mae Smith Simmons, alleged that she had suffered sprain, cuts and bruises about the neck on the right side; bruises about the lower rib; bruises and sprain of muscles in the upper portion of the abdomen; shock and emotional upset.
The case was duly tried and the District Judge awarded to plaintiff, James H. Simmons, the following special damages which are not contested on appeal, to-wit:
For medical services of Doctor Moody $70.00
Medical services of Doctor Leroy M. Conn 16.00
Medical services of Doctor Louis A. Hazouri 180.00
St. Francis Hospital 91.30
Baton Rouge General Hospital >10.00
Harvey’s (Cervical collar) 10.00
Hotel Istrouma 3.03
Transportation 21.68
Value of plaintiffs’ car in amount of 307.33
Frank H. Duncan, Court reporter, for deposition 75.00
Fee to Dr. L. F. Magruder in sum of 100.00
or a total of $884.34.
In addition, the fees of Drs. Moody, Edel-man, Hazouri and Conn for expert testimony given on the trial of the case are fixed at $50 each and taxed as costs.
As to damages for personal injuries allegedly suffered by Mr. and Mrs. Simmons the Judge below had the following to say and made the following award, therein:
“From my observation of Mr. Simmons on the trial of this case, very frankly I was not impressed with his demeanor on the witness stand. There is no question but that Plaintiff was somewhat shaken up because of the act of the driver of the car insured by Defendant running into the back of his car but, inasmuch as the law requires that he prove his case by a preponderance of evidence, taking into consideration his prior work record and the absence of objective pathological findings to substantiate his complaints of serious injury, I am of the opinion that Plaintiff, at most, sustained a good shaking up with possibly some muscular strain of the muscles of his neck for which no permanent injury can be attributed, and therefore I believe an award to him for such injuries, including loss of wages, if any, during the period of his treatment by Doctor Haz-ouri in the amount of $500.00 would be adequate.
“His wife, Mrs. Simmons, was pregnant at the time the alleged collision took place and very fortunately the child was born without any injuries to it and she experienced no difficulty except being shaken up and bruised. For her, I am of the opinion an award of $250.00 is adequate.”
Plaintiffs have appealed and asked for a substantial increase in the award to each for the damages on account of their personal injuries and also for loss of time by the plaintiff, Jack Simmons. At the outset, after reading the testimony of the plaintiff Jack Simmons, we can readily understand the lower court’s open criticism of his demeanor and testimony in its written reasons for judgment. However, his case as well as his wife’s is practically wholly dependent upon the medical testimony in the record.
*261 The first doctor to examine Jack Simmons found that he had complaints in his chest near the sternum. He also complained of aches and pains in his neck, near the back, and had contusions of the lower right leg. Dr. Moody, on examination, found bruises of his ribs and the cartilages of the anterior chest wall from the sixth to the tenth bilateral, also bruises in the lower end of the sternum and signs and symptoms of a whip-lash injury. Dr. Moody also testified that the main purpose of his examination of plaintiff was to determine whether he could safely ride the bus to Georgia and receive further medical treatment in Georgia. Dr. Moody, after determining the nature of Mr. and Mrs. Simmons’ injuries, informed them, in his opinion, it would be safe for them to travel by bus. Jack Simmons was treated by Dr. Leroy M. Conn upon his return to Georgia. Dr. Conn saw the patient on the 21st, 22nd and 27th of June, Plaintiff’s main complaints being of a headache and a pain in the neck. After having x-rays made of plaintiff, James H. Simmons, Dr. Conn made no significant findings from the x-rays. The x-rays were taken at his first visit to Dr. Conn. He also examined the plaintiff in September and upon being questioned as to plaintiff’s condition on September 3, 19SS, testified as follows, to-wit:
“Q. Doctor, have you testified as to what you found his condition to be on September 3, 1955, when you last saw him; or did you examine him at that time or merely refer him to Dr. Hazouri? A. No, I examined him at that time.
“Q. What did you find his condition to be when you examined him on September 3, 1955? A. Well, he still had this muscle spasm in his neck, and his complaints were at this time referrable to his neck.
“Q. Now, when you first examined him back on June 20, 1955, you say he was complaining then of spasms of the neck and they were mild ? A. Pain in the neck was his complaint and he did have this muscle spasm, in his neck " (Emphasis added.)
On September 3, 1955, Dr. Conn, after his examination of Mr. Simmons, referred him to Dr. Hazouri, who was a neurosurgeon. Dr. Hazouri first examined the plaintiff on the 6th day of September, 1955, and estimated that he saw the plaintiff some 14 times after that. This doctor hospitalized Jack Simmons in the St. Francis Hospital for six days. During the time he was hospitalized, Dr. Hazouri stated that in his opinion the plaintiff had a whiplash injury to his neck and as a result of his findings, he placed Mr. Simmons in traction. The objective symptoms found by Dr. Hazouri can be seen by quoting a portion of his deposition as follows:
“Q. Did your diagnosis depend upon what he told you exclusively, or did it also involve objective findings? A. Of course, the history was most important and the positive findings reveal that there was tenderness with muscle spasms over the nape of the neck, that is, muscles in the base of the skull; and that whenever we manipulated, that is, moved the neck from side to side, there was some pain; and when we extended the neck, such as one would do in placing the head into traction; there was some relief. There was a minimal component of nerve root compression, which we felt was present on the basis of a small area, or areas if you wish, of impaired sensation; and in view of this felt that certainly, with his history and his findings, that there definitely was a component of nerve root compression.”
Also, after examining x-rays of the plaintiff, Dr. Hazouri testified as follows:
“Q. In your opinion, did that have any relation to the injury which he described to himself as receiving? A. Well, since he was injured in June of 1955, and we saw him on the 6th of September — these x-rays were made on *262 the 7th. In other words, some three and a half months or thereabouts had elapsed. It would be awfully hard as to where, or rather the origin of the spur unless one had x-rays before to compare them. However, one could say that with arthritic changes, if you wish, or spurring present, one would be more prone to have an injury to the neclc in a recoil type of an affair, because of the small spurs breaking or shredding, if you wish, or tearing. It would be just like breaking or striking your knee with a small mouse which is commonly referred to' as a free piece of calcium in the joint. It is on that same principle. I would say you would have more inclination toward hurting your neck.”
In explaining plaintiff’s headache, Dr. Hazouri testified as follows:
“Q. Would this spurring condition in and of itself cause the complaints that Mr. Simmons had? A. Well, that is a point that has caused a considerable amount of controversy in the medical profession, really. At least it is my opinion that if a spur is large enough, that certainly — and by pressure on the nerve root, that you can get pain into the arm or into the shoulder; or that if you have enough changes within the joint that you can get pain into your neck. In other words, your headache could be on the same basis as a back ache from a disk down the lumbar region.”
Dr. Hazouri also testified under direct examination concerning the probability of plaintiff suffering from apprehension and nervousness. Dr. Hazouri also had objective findings which were caused from nerve compression.
“Q. Doctor, in your letter of September 8 to Dr. Conn, you speak of a patchy type of loss of sensation. Would you tell us what that is and how it is diagnosed? A. Actually, that infers from using several methods of testing, such as a straight pin for one component; the whisp of hair if you wish, for a second component of sensation; the tuning fork is another form of testing for sensation; and a tube full of hot water and a tube of cold water for testing those particular sensory modalities. In this particular case, a pin was used to test and see whether there was any impairment of sensation, which implies, or infers, if you wish, if there is any injury or irritation or actual destruction of nerves. There are certain fairly clear-cut patterns of nerves that come out of the brain and the spinal cord and then reorganize themselves and give certain patterns. If you wish, it is a method of sighting or precisely noting the sight of an injury to a nerve; and in this particular case the second cervical nerve root bathes or enervates the back of the scalp about an area the size of four or five inches in diameter and actually goes down into the face around the chin and the jaw bone, but not into the cheek. And by using this test it would imply that this is one of the most common injured nerves during the recoil injury because it is a rather long nerve and it is about some five or six inches in length and consequently is more prone to injury than the remainder of the cervical nerves. It is merely another type, if you wish, or another form of confirming or another bit of information to implicate an injury to the cervical spine in this particular type of injury.
“Q. Well, did the loss of sensation that you found in Mr. Simmons indicate an injury to that nerve? A. It indicated that some pathology was existing in that particular nerve and I have to make the assumption that this was related to his injury.”
There is no medical testimony that the plaintiff was a malingerer other *263 than a suggestion that a previous or prior tendency to neurosis might have been enhanced or aggravated as a result of the accident and injuries. We are convinced from all the medical testimony of the doctors who examined plaintiff immediately after and subsequent to the accident, with the exception of Dr. Edelman, who examined him one time 18 months after the accident, that plaintiff Jack Simmons suffered what might be termed a moderately severe whiplash injury, similar but somewhat more severe than that received by the plaintiff in the cases of Attaya v. Zimmerle, La.App., 83 So.2d 676; Lampkin v. United States Fidelity & Guaranty Company, La.App., 99 So.2d 147. In both these cases, the plaintiff was awarded $2,-500. We believe that an award of $3,000 would be proper in the present case.
As to plaintiff’s claim for loss of wages, we believe that the record will support a finding that the failure to work steadily other than when he was hospitalized for approximately one week was due to his injuries as a result of the accident. His work record was stipulated as follows, to-wit:
“Prior to the accident on June 18th, 1955, the plaintiff, James H. Simmons, was last employed by Super Oil Company, in Columbus, Georgia, where he worked for two weeks during the year 1954 and where his wage was 75‡ per hour.
“The total income reported by the plaintiff, James H. Simmons, as earned on his 1954 tax return was $70.00 derived from this employment.
“Following the accident on June 18th, 1955, the plaintiff James H. Simmons, was employed by Millwork Manufacturing Company, beginning on July 8th, 1955 and through the 11th day of August, 1955, as a truck driver at a wage of $1.10 per hour.
“Plaintiff, James H. Simmons, resigned from this employment on the 11th day of August 1955, and worked for L. C. Alexander on the 12th day of August, 1955 at a rate of 90(5 per hour, earning $11.25.
“Plaintiff, James H. Simmons, was employed by National Linen Supply Company, Columbus, Georgia at least four days in August, 1955, at a wage of $1.00 per hour.
“Plaintiff, James H. Simmons, was employed by Martin or Royal Theatre in Columbus, Georgia, beginning October 22, 1955, where he is still employed and he has not missed any time since he commenced employment with them on the 22nd day of October, 1955.”
The Lower Court in his written reasons for judgment found that plaintiff’s record for industry was not good. The Lower-Court stated:
“In the testimony offered on the trial of the case, the record of the plaintiff for industry in pursuing and keeping employment of any kind was not good. A review of the testimony could only leave one with the impression that plaintiff, Mr. Simmons, exhibited no ambition and industry prior to the date of this alleged accident. Further, in my opinion, the axiom ‘A rolling stone gathers no moss,’ would certainly be applicable in evaluating his work record, prior to that time. Ordinarily such observation is probably irrelevant to the determination of the quantum a plaintiff might be entitled to for physical damage to his person.”
We do not believe that plaintiff would have subjected himself to hospitalization and traction as well as a neck brace had he not been suffering. Plis complaints of pain were borne out by the objective findings of Dr. Hazouri as late as September, and of Dr. Moody who found muscle spasm. We find from the medical testimony that plaintiff immediately complained of a neck injury, and Dr. Moody found that he had *264 suffered a moderately severe whiplash injury with muscle spasm; that he complained of suffering with his neck in the interim from the date of the accident until he saw Dr. Hazouri and was hospitalized, and that in addition, Dr. Hazouri in September found muscle spasm still existing as a result of the whiplash injury.
We are of the opinion that even though his work record was intermittent that he did suffer from his neck injury so as to interfere with steady employment of the kind that he was attempting to do prior to his hospitalization and employment by the Royal Theatre. Plaintiff has prayed for $240 for loss of wages which is amply supported by the facts.
Mrs. Simmons was examined by Dr. Moody on the day of the accident and he found “small bruises about the neck on the right side; there were pulled muscles in the neck on the right side; there was soreness and bruised muscles of the upper abdomen and pain over the lower half of the rib cage, anterially and bilaterally. It was also determined that the patient was approximately two months pregnant at the time.” Dr. Moody also found Mrs. Simmons rather upset and concerned at the time and, as he testified, her main concern was that of a miscarriage or abortion from the results of the accident. From his examination he felt that she could proceed home but he asked her to report to Dr. Gibson as soon as she got there. The nature of her injuries was not serious and left no disability. The main damage would be for some suffering as a result of soreness and pain and anxiety and mental anguish for fear of a miscarriage. The testimony is rather scant as to Mrs. Simmons’ pain, suffering and anxiety but we believe that an award of $500.00 would be proper.
It is therefore ordered that the judgment of the District Court be amended by awarding to the plaintiff Jack Simmons the sum of $3000.00 for pain, suffering and disability as the result of his whiplash injury and other minor bruises and the additional sum of $240.00 for loss of wages, and that Mrs. Jack Simmons be awarded the sum of $500.00 for her pain, suffering, mental anguish and anxiety.
As thus amended the judgment of the district court is affirmed in all other respects.