106 So.2d 752 (1958)
Carney C. WATTS et al.
v.
DELTA FIRE & CASUALTY COMPANY et al.
No. 4681.
Court of Appeal of Louisiana, First Circuit.
November 21, 1958.
*753 Watson, Blanche, Wilson, Posner & Thibaut, David W. Robinson, Baton Rouge, for appellants.
Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for appellees.
LOTTINGER, Judge.
This is a suit for damages resulting from a rear-end collision which occurred in the City of Baton Rouge on June 3, 1957. The plaintiffs are Mrs. Nancy Lovell Watts, the driver of the forward vehicle, and her husband, Carney C. Watts, the latter seeking to recover for property damage to the automobile and medical expenses and the former seeking to recover for the personal injuries suffered by her as a result of the accident. Joined as defendants are the driver of the following vehicle, the owner thereof, and the latter's liability insurer.
By stipulation entered into at the commencement of the trial, liability was admitted by the defendants, with the result that the only issue presented to the Lower Court was that of quantum.
Judgment was rendered in favor of Mrs. Nancy Lovell Watts in the sum of $3,500 and in favor of her husband, Carney C. Watts, in the sum of $316.74. The defendants have appealed and the plaintiffs have answered the appeal asking that the awards to them be increased or, alternatively, that the judgment be affirmed.
At the time of the accident, Mrs. Watts was employed as a secretary for Snells Limbs and Braces. The accident occurred during the noon hour and she returned to work that afternoon and completed her day's work. That night she consulted Dr. Thomas Campanella who examined her, had x-rays taken and found she had sustained a whip-lash injury of the neck. She was neither treated by Dr. Campanella at that time nor was she hospitalized. The next day she testified that she returned to her work and the occasion of her next visit to Dr. Campanella was a week and a half or two weeks later. According to Dr. Campanella, she was seen by him on June 3rd, 7th, 14th and 26th 1957 and on August 6th and October 31st of the same year.
Mrs. Watts testified that during the day and evenings for two weeks following the accident she wore what is called a Thomas Collar and that thereafter for a period of three weeks she wore it at home at night. In addition, she used traction for forty-five minutes to an hour "almost continuously for about two months * * * after the accident." Thereafter, she used it about three times a month until October and, at the time of trial (March 20, 1958), she stated that she used it "just once in a great while, every three or four weeks." She testified that she used a "cervi-pillow" every night following the accident.
Mrs. Watts testified that her neck, right shoulder and arm have bothered her since the accident but that on some days she experiences no pain or discomfort. She further testified that since the accident she had not been able to do her housework, which testimony was corroborated by her husband. It further appears that on occasion she has trouble sleeping and that she takes aspirin when her neck, shoulder or arm is bothering her.
It does not appear that Mrs. Watts lost any time from her work except on two or three occasions when she visited her doctor. She continued her employment at Snells until December of 1957 when she began *754 work at Louisiana State University for slightly higher wages.
The record reflects that in December of 1957 Mrs. Watts was again involved in a rear-end collision. We are not convinced from the evidence, both expert and otherwise, however, as counsel for defendants urge us to believe, that her present discomfort is connected with the second accident.
The pertinent part of Dr. Campanella's testimony is as follows:
"Q. Dr. Campanella, did you have occasion to examine Mrs. Nancy Lovell Watts for injuries allegedly received in an automobile accident on June 3, 1957? A. Yes, I did.
"Q. Would you state when you first saw Mrs. Watts? A. I saw Mrs. Watts shortly after the accident.
"Q. Was that on the same day of accident? A. On the same day of the accident.
"Q. What was her complaint at that time? A. She was complaining of neck pain and pain in her shoulder, the right shoulder.
"Q. What was your diagnosis? A. I thought that Mrs. Watts at that time had sustained more or less a whiplash injury of her neck, which resulted in strain of the back muscles of the neck, and she also had sustained a bruise over the right collar bone.
"Q. Did that bruise cause any thickening of the bone tissues or a lump to form at that time? At that site? A. Yes, she had a very large lump. As a matter of fact, I thought perhaps she had a fracture of the clavical but the x-ray did not show that, but I presume she had a little bleeding in that area that caused the periosteal reaction.
"Q. Is that permanent? A. I don't believe so, no.
"Q. Was there any muscle spasm present at the time of your initial examination of Mrs. Watts? A. Yes indeed. She had considerable restriction of motion of the neck in all directions and had spasm of the back muscles, called trapezius muscle, one on each side of the neck, the entire musculature of the neck was quite tight in fact.
"Q. I believe that you ordered x-rays taken and that those x-rays indicated that there were no fractures or bony abnormalities, is that correct? A. That is right.
"Q. The injuries to Mrs. Watts' neck and shoulder area were injuries to the soft tissues, that is muscles, ligaments and so forth? A. That's right.
"Q. Now, in your practice as a medical doctor have you had occasion to examine and treat a number of people complaining of whiplash injuries? A. Yes, sir.
"Q. How would you classify the severity of Mrs. Watts' whiplash injury with reference to those involving only a soft tissue injury, no fracture? A. The ones that simply involve a pulled muscle I should think that those are more or less mild as compared to the ones in which you have nerve involvement or joint involvement.
"Q. Is there any indication here that there may be a neuritis or intracostal nerve involvement as a result of this pain which allegedly radiates into her right arm? A. Yes, the examination that was performed on the last examination on March 13, 1958, indicated some evidence of the intracostal nerve involvement in which she has a tender area of the nerve in between the ribs and to pressure on this area she would have radiation of the pain along the lateral aspect of the chest. This was not found in the previous examination. *755 This could mean that perhaps she had developed some nerve involvement.
"Q. As a result of your most recent examination of Mrs. Watts, what would you say her present condition is? A. I thought that she had done rather nice from this injury, but I didn't think that she had fully recovered as she still had evidence of muscle soreness and occasional periods of disability. However, this is quite typical with this type of injury. The prognosis is hard to determine. You don't know who is going to get well and who is not, and I thought that she had done remarkably well in spite of the fact that she still had some soreness, and particularly to the right trapezius muscle, and had developed this sore spot in the infra-scapula area of the right side.
* * * * * *
"Q. Dr. Campanella, as a result of your seeing and treating Mrs. Watts as you have since the date of this accident until the present time, would you say that the disability or complaints which she now has she will probably have in the future? A. Yes, probably so.
"Q. Do you have any estimate as to how long those complaints will or might last in the future? A. The average time for this type of injury is about eighteen months. That's about an average time.
"Q. Could it be longer? A. It could.
"Q. Up to several years? A. Yes.
* * * * * *
"Q. Dr. Campanella, I'm not going to be long on this but to clarify the last part of your testimony with regard to whiplash and all that, actually a whiplash could result in a strain or a sprain or a subluxation or even a fracture, could it not? A. Yes, sir.
"Q. And probably the mildest form of whiplash injury is the strain? A. That's right.
"Q. Can you think of one that could be milder? A. No, I can not.
* * * * * *
"Q. And this particular whiplash sustained by Mrs. Watts in the accident of June was one involving strictly the soft tissues, involved no nerves and no bones? A. That's right.
"Q. And your report of March 17, 1958, which counsel for plaintiff has quoted partially from contains the statement that, `This patient apparently had made a very nice recovery from this serious injury.' A. Yes, that's right.
"Q. And that was your entire statement, wasn't it? A. Yes."
Dr. W. R. Schaffarzik, called as a witness for the defendants, gave the following testimony:
"Q. Now, Dr. Schaffarzik, did you examine Mrs. Nancy L. Watts or Mrs. C. C. Watts on March 13, 1958? A. I did.
"Q. Did you make a physical examination of her at that time? A. Yes.
"Q. Did you find any restriction in motion of any parts of her body? A. I did not.
"Q. Did you find any objective symptoms of any injury at all? A. There were no objective signs of injury to her.
* * * * * *
"Q. Did you find that she had sustained any injury which might result in any real disability? A. I had no objective signs to say that. Her history was such that it was reasonable to believe that she had had an injury such as she described. I didn't think she would have any permanent disability as a result of this injury. However, I believed in her complaints.

*756 "Q. Now, you are familiar with all the categories of whiplash injuries, rather whiplash accidents and the injuries which result from them. How would you classify this one,would you classify it in the sprained category or strained category or what? A. On the basis of the recovery that this woman has shown following her injury I would put it in the acute strain catagory. Compared with other such cases she has done quite well.
"Q. Her injury was more the soft tissue type injury? A. Yes.
"Q. And the strain type is the least severe of the whiplash type category? A. That's my understanding."
In urging us to increase the judgment in favor of Mrs. Watts, counsel seem to rely principally on the awards granted in Bartholomaus v. H. G. Hill Stores, Inc., La.App., 97 So.2d 82 ($6,000) and Baker v. United States Fire Insurance Co., La. App., 89 So.2d 405 ($5,600) whereas counsel for defendants, on the other hand, urge us to grant an amount less than that given in Attaya v. Zimmerle, La.App., 83 So.2d 676 ($2,500) and Simmons v. Pierce, La.App., 104 So.2d 258 ($3,000). Naturally, the facts in this case are not identical to those in any of the cited cases and our appreciation of the record in this case is that Mrs. Watts' injuries, while more serious than those suffered by Miss Attaya and Mr. Simmons in the Attaya and Simmons cases they were less severe than those undergone by Mrs. Bartholomaus or Mr. Baker in the Bartholomaus and Baker cases, and, hence, that an appropriate award would lie somewhere between the two extremes. We furthermore believe that the award of $3,500 is neither excessive nor inadequate and that it does substantial justice between the parties.
Counsel for defendants urge that the trial judge erred in awarding Mr. Watts a $35 item in Dr. Campanella's bill as this charge was admittedly for an examination and report of March 13, 1958, in preparation for trial. Counsel made timely objections to the introduction and the item is not allowable. See McCrory v. Great American Indemnity Co., La.App., 92 So.2d 742.
For the reasons assigned the judgment appealed from is affirmed except insofar as the award to Carney C. Watts in the sum of $316.74 which is hereby reduced to the sum of $281.74.
Judgment amended and as amended affirmed.