123 So.2d 658 (1960)
Dolphus McKAY, Sr.
v.
SOUTHERN FARM BUREAU CASUALTY COMPANY et al.
Nos. 4986, 5091.
Court of Appeal of Louisiana, First Circuit.
March 21, 1960.
On Application for Rehearing May 31, 1960.
On Rehearing October 6, 1960.
Rehearing Denied November 2, 1960.
Certiorari Denied January 9, 1961.
*659 Palmer & Palmer, Amite, for appellant.
H. H. Richardson, William C. Bradley, Bogalusa, for appellees.
Before LOTTINGER, TATE, FRUGE, LANDRY and PUGH, JJ.
PUGH, Judge ad hoc.
On December 10, 1956, Dolphus McKay filed this suit against H. E. Bankston and his liability insurance carrier, Southern Farm Bureau Casualty Co., for injuries he allegedly sustained as the result of an automobile collision which occurred December 13, 1955. On June 21, 1957, after issue was joined but before trial, Dolphus McKay died of cancer. His wife had predeceased him, and those of his children who were minors at the time of his death were substituted as parties plaintiff. The substituted plaintiffs are Dolphus McKay, Jr., and Mattie May McKay (both of whom are represented by duly appointed tutors) and Austin McKay (who was a minor at the time of his father's death, but who had attained majority at the time the motion for substitution was filed). In their brief filed in this Court, it is conceded by plaintiff's counsel that, according to the medical testimony in the record, the cause of Dolphus McKay's death was unrelated to injuries he allegedly sustained in the automobile collision. It should be noted at the outset that the substituted plaintiffs are asserting the father's alleged cause of action, and that there is no claim by the children for injuries they sustained as a result of their father's death.
From the decision of the lower court awarding the substituted plaintiffs $3,971 ($1,764 for loss of wages sustained by Dolphus McKay, $2,000 for pain and suffering sustained by him, and $207 for his medical expenses), the plaintiffs have appealed, praying that the amount awarded be substantially increased. Defendants have answered the appeal, praying that the judgment appealed from be reversed and the claim disallowed.
The accident in question occurred at approximately 5:00 p.m., December 13, 1955, within the corporate limits of the Town of Tangipahoa, Parish of Tangipahoa, at the intersection of U. S. Highway 51 (a paved road) and State Highway 149 (a blacktopped road). Dolphus McKay *660 was riding in the back seat of an automobile driven by Melvin E. Holden. There were two other passengers in the Holden vehicle, Otis Blunt and George Hughes, both of whom were riding in the front seat with Holden. The Holden vehicle was proceeding north on U. S. Highway 51, and the vehicle owned and operated by defendant H. E. Bankston, in which defendant's wife was riding as the sole passenger, was proceeding south on the same road. The collision occurred when Bankston attempted to execute a left turn into the intersecting state highway. The district court found that the collision in question was caused by the negligence of Bankston, and we are convinced that the lower court's finding in this regard is clearly correct.
U. S. Highway 51 and State Highway 149 intersect each other at right angles. Visibility was good and there were no curves impairing the vision of either driver. Both Bankston and his wife saw the Holden car approaching, and from a study of the record, it is clear that the defendant Bankston was negligent in attempting a left turn in the way that he did in the face of the clearly visible oncoming vehicle.[1]
The facts of this case are certainly distinguishable from those presented in Massicot v. Nolan, La.App.1953, 65 So.2d 648, which is relied upon heavily by the defendants. In the Massicot case, the driver attempting to make a left turn had almost completed it when the impact occurred a short distance from the curb. Here Bankston himself testified that the impact occurred in Holden's lane of traffic, just as Bankston began to make the turn. It is true that here, as in the Massicot case, the oncoming vehicle (the Holden car) may have been travelling at an excessive speed, but this did not relieve Bankston of the duty *661 to ascertain that the left turn could be executed with safety. In the recent case of Washington Fire & Marine Insurance Company v. Firemen's Insurance Company, 1957, 232 La. 379, 384, 94 So.2d 295, 296-297, the Supreme Court stated:
"The cases are legion which hold that before making a left turn the driver of an automobile must ascertain that he may do so safely; not only is this cardinal rule of the road founded on common sense, but in our State is a positive enactment, incorporated in the Revised Statutes as R.S. 32:235, by the terms of which it is the mandatory duty of the driver of any vehicle on the highways of this State to ascertain, before turning upon any highway, that there is no traffic, vehicular or pedestrian approaching from either direction which will be unduly delayed; and said driver "shall yield right-of-way to such approaching traffic and shall not attempt to make a turn unless the way is clear.' (Emphasis ours.) Among pertinent cases are Lane v. Bourgeois, La.App., 28 So.2d 91; Home Insurance Co. v. Warren, La.App., 29 So.2d 551; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264; Malone v. Fletcher, La.App., 44 So.2d 352; Zurich Fire Ins. Co. of New York v. Thomas, La.App., 49 So.2d 460, and Codifer v. Occhipinti, Codifer v. Occhipinti, La.App., 57 So.2d 697. In the last cited case the Court of Appeal for the Parish of Orleans aptly stated that `When such a left-hand turn is being made and an accident occurs, the burden rests heavily on the driver who is making the left-hand turn to explain how the accident occurred and to show that he was free from negligence.' 57 So.2d at page 699."
It is quite clear from the record that the accident was caused by Bankston's negligence in attempting a leisurely left turn in the face of the clearly visible oncoming Holden vehicle.
The defendants contend that Melvin E. Holden, the driver of the Holden vehicle, was contributorily negligent, and that his alleged contributory negligence is attributable to Dolphus McKay, for it is claimed that Dolphus McKay and Melvin Holden were engaged in a joint venture. This contention is without merit. Although there is evidence in the record that the three passengers were paying Holden to ride with him, it is clear from the jurisprudence that in order for occupants of a vehicle to be considered joint venturers, they must have an equal right, express or implied, to direct and control the conduct of each other in the operation of the vehicle. See Squyres v. Baldwin, 1938, 191 La. 249, 185 So. 14, and the recent decision in Pierson v. Hartford Accident & Indemnity Company, La.App.1959, 107 So.2d 465. There is certainly no evidence in the record that such a right existed here. Since there is no showing that Dolphus McKay was himself guilty of negligence, or that he was engaged in a joint venture with Melvin Holden, it is irrelevant to our decision in this case whether Holden was or was not guilty of contributory negligence.
It is clear from the record that the trial court was correct in its finding that Dolphus McKay sustained injuries in the collision. Whether the court was correct in fixing damages, however, is another question. There is no evidence that prior to the collision he complained of neck pain or incapacity. Otis Blunt testified that a few minutes after the accident, McKay complained of dizziness and that he (Blunt) had helped McKay across the road. The day of the automobile collision McKay was treated by Dr. Small, to whom he stated that he had been in a car wreck. Dr. Small found that McKay had paravertebral muscle spasms and recalls his diagnosis of the condition as a whiplash injury to the neck and back. He stayed under Dr. Small's care for about a week, then was treated by Dr. Rosen (hereafter discussed). Later he was again treated by Dr. Small *662 at various times. He missed work the day after the accident, but returned the following day. On his return, he stated that he had been in an accident and made complaints concerning his neck. On the Monday following the accident (December 19), he worked only 1¾hours, and because of the injury, worked no more that week. On December 19, he visited Dr. Rosen, complaining of injuries received in an automobile accident December 13. While under the care of Dr. Rosen, McKay was admitted to the hospital for two days and then later readmitted for another two days. Dr. Rosen testified that McKay had severe disability when he first saw him, which later improved. Subsequently, however, McKay's condition grew considerably worse. Dr. Rosen's diagnosis was "whiplash injury to cervical spine, traumatic tracheitis, lumbo-myocelitistraumatic." Dr. Rosen fitted McKay with a celluloid extension collar and testified that on his discharge for work on January 3, 1956, McKay still had the residual of the whiplash, still had pain and muscle spasm. Anodynes were prescribed for the pain which he continued to suffer.
Although McKay returned to work on January 3, 1956, and was able to stay for eight more weeks doing lighter work, he complained of pain, continued to have medical care, held his head to one side, and was quite limited in neck motion. His immediate superior testified that it seemed like "the longer he worked the worse it got." His injury finally forced him to stop work on February 20, 1956, his last work day. McKay's condition did not improve as might have been anticipated. He wore a neck brace almost constantly until he died, and never returned to his job. He consulted a number of physicians over the entire period and their testimony, with one exception, is quite consistent. The incapacity and pain persisted. Dr. Le Noir, an orthopedic surgeon, examined McKay three times between May 1956 and December 1956, and concluded that basically McKay's difficulty was a degenerated cervical disc, with the possibility of herniation of this disc. He found on his last examination (December 4, 1956) McKay had a 75% restriction in all phases of neck motion and a severe cervical muscle spasm. Perhaps the reason for the prolonged incapacity and pain is to be found in the testimony of Dr. Pike, who testified that, although in his opinion the cancer which caused McKay's death was in no way related to injuries received in the collision (and this is in accord with the other medical testimony), carcinoma metastasis in the neck region would have prolonged and aggravated the neck injuries. Shortly prior to McKay's death a biopsy of a node from McKay's armpit showed he was suffered from metastasis epidermoid carcinoma.
It is of course difficult to determine what portion of McKay's lost earnings is attributable to injuries suffered in the accident and what portion to the cancer of which he died. Such a determination must, however, be made. The trial court concluded that the onslaught of cancer was "evidently some time between December 4, 1956, which is the date Dr. Le Noir examined him and found no organic cause for the pain he was suffering, and February 20, 1957, which is the date of Dr. Wickstrom's examination which found him to be suffering from carcinoma and uremia." We feel that this finding is clearly erroneous, for a close study of Dr. Wickstrom's testimony shows conclusively that he did not make this finding or diagnosis. We feel that the disability caused by the cancer began later than this, probably prior to Dr. Small's examination in April 1957. At that time Dr. Small found McKay practically bedridden, sick at his stomach and vomiting. In any event, it seems quite clear that disability caused by the cancer occurred prior to June 1, 1957, for Dr. Nix testified that when he saw McKay on June 16, 1957, McKay's main complaints were of abdominal pain, and McKay at that time stated to the doctor that he had had this pain for three weeks. From the above, we conclude that injuries resulting from the *663 automobile collision caused McKay to lose approximately 57 weeks' earnings (one week prior to February 20, 1956, and 56 weeks' earnings from that date to March 20, 1957, which we estimate to be the date on which disability caused by cancer began). The trial court properly found that McKay's work week averaged forty hours, and at the time his employment was officially terminated his wage rate was $1.05 per hour. Employing these figures, we conclude that $2,394 should be awarded for lost wages.
Of course, a similar problem is encountered in attempting to fix the damages sustained by McKay as the result of the pain and suffering caused by his injuries, for clearly some of his pain and suffering was attributable to other factors, particularly the cancer. The trial judge fixed McKay's damages in this regard at $2,000, which we feel to be inadequate, especially when it is considered how long the suffering and discomfort continued. We feel that $4,000 would be more appropriate, and more in line with the prior cases. See Attaya v. Zimmerle, La.App.1955, 83 So.2d 676; Baker v. United States Fire Insurance Co., La.App.1956, 89 So.2d 405, and Bartholomaus v. H. G. Hill Stores, Inc., La.App.1957, 97 So.2d 82.
We find no error in the trial court's refusal to include Dr. Le Noir's bill for professional services as an item of damages, for Dr. Le Noir's testimony itself shows that, as he viewed his function, he was not being consulted for treatment. His examination of McKay was for the purpose of preparing a report to be used in preparation for trial. See Watts v. Delta Fire & Casualty Co., La.App.1958, 106 So.2d 752.
For the reasons assigned, the judgment appealed from is amended so as to increase the total amount awarded to $6,601 ($2,394 for loss of wages sustained by Dolphus McKay, $4,000 for pain and suffering sustained by him, and $207 for his medical expenses), and as amended, the judgment appealed from is affirmed. All costs of this appeal are to be paid by defendants.
ELLIS, J., recused.

On Application for Rehearing.
PER CURIAM.
The defendants-appellants have filed an application for rehearing in which they point out that (after issue was joined in this suit) the original plaintiff, Dolphus McKay, Sr., died on June 21, 1957 and that the present plaintiffs (Austin McKay and the minors Dolphus McKay, Jr., and Mattie Mae McKay) were not substituted for him until October 2, 1958, more than one year later. Exceptions of no right and cause of action and of prescription and peremption have been filed by the defendants-appellees in this court following rendition of our original opinion in which, for the first time, the contention is advanced that the plaintiffs' cause of action has prescribed or perempted because of the failure to have them substituted for the deceased plaintiff within one year of the latter's death; even though Dolphus McKay, Jr., and Mattie Mae McKay had filed on June 5, 1958 (within the peremptive year) a "Rule to Show Cause" why they should not be allowed to be substituted as parties plaintiff.
The application for rehearing is granted, limited to the question of prescription or peremption (our original opinion having disposed of defendants' other contentions). The court particularly invites argument concerning the problems that may or may not have been created by the absence of Austin McKay as party to the pleadings filed on June 5, 1958.
Application for rehearing granted, restricted to the issue of peremption or prescription.

On Rehearing.
TATE, Judge.
Defendants-appellants in their application for rehearing pointed out that after issue was joined in this suit the original plaintiff, *664 Dolphus McKay, Sr., died on June 21, 1957 and that the present plaintiffs were not formally substituted for him until October 2, 1958, more than one year later. Exceptions of no right and no cause of action and of prescription and/or peremption were filed by the defendants-appellants in this court following rendition of our original opinion in which, for the first time, the contention is advanced that the plaintiffs' cause of action has perempted and/or prescribed because of the failure to have them substituted for the deceased plaintiff within one year of the latter's death. A rehearing was granted, restricted to the question of prescription and/or peremption which had for the first time been raised by this application for rehearing.
In support of their plea of prescription and/or peremption, the defendants-appellants rely upon the provision of LSA-Civil Code, Article 2315 that the "right of action" for tort-caused damage survives in favor of the children of the deceased only "for the space of one year from the death." It is contended these children must have been substituted as plaintiffs within one year of their father's death, otherwise their claim had perempted, relying upon Lally v. Taylor, La.App.Orl., 117 So.2d 602; Miller v. American Mut. Liability Ins. Co., La.App. 1 Cir., 42 So.2d 328.

I.
The record shows that on June 5, 1958 (within one year of the decedent's death) "Dolphus McKay, Jr. and Mattie Mae McKay, both minors, represented by their guardians, Marshall McKay and Herley McKay" filed a "Rule to Show Cause" praying that the defendants show cause "why relators Dolphus McKay, Jr. and Mattie Mae McKay, should not be entitled to the following relief, to-wit: (1) That Dolphus McKay, Jr. and Mattie Mae McKay be allowed to be substituted as plaintiffs in this suit by virtue of the death of their father. (2) That relators, Dolphus McKay, Jr. and Mattie Mae McKay be granted an order of this Court substituting them as petitioners in this suit. * * *" The allegations of the rule set forth the death of the decedent and the right of his minor children to be substituted as parties plaintiff in his place. The rule further prayed that the respective custodians of the two minors be appointed as tutors to aid and assist them in prosecuting this litigation.
The rule was fixed for June 20, 1958 by order of court and was served on counsel for defendants-appellants on June 9, 1958.
On June 20, the defendants filed pleadings excepting to the capacity of the two minors and to that of their "guardians" as an improper substitution of parties plaintiff and further alleging that the rule to show cause set forth no right and no cause of action. The minute entry for that date (June 20) shows that the court sustained these exceptions and gave the plaintiffs the right to amend the proceedings. We are informed that the basis of this judgment was that the "guardians" could not be substituted as parties plaintiff unless they were properly qualified as tutors by probate proceedings.
On October 2, 1958, by motion (pointing out, inter alia, that the tutors of the two afore-mentioned minors had been formerly qualified as such on August 21, 1958) and order, these two minors ("Dolphus McKay, Jr. and Mattie Mae McKay, represented by their duly-appointed tutors, Herley McKay and Marshall McKay"), together with Austin McKay, were substituted as parties plaintiff and authorized to prosecute the action.
The motion identified Austin McKay (who for the first time appeared as a party to the pleadings in this motion of October 1958) as a child of Dolphus McKay, Sr. born on August 21, 1936, who was therefore a minor at the time of his father's death on June 21, 1957.

II.
Exceptions of no right and no cause of action are filed by the defendants-appellants *665 in this court questioning the right of Austin McKay to be substituted as party plaintiff for his deceased father. These exceptions are based upon the ground that, even though Austin was a minor at the time of his father's death, he was a major at the time he filed pleadings to be substituted as a party plaintiff to this suit. It is urged that Austin was without right under the specific wording of LSA-Civil Code, Article 2315 ("* * * the right of action shall accrue to the major children only in those cases where there is no surviving spouse or minor child or children * * *") in the version of the enactment applicable to these proceedings,[1] since the decedent was also survived by other children still minors at the time that Austin sought to be substituted as plaintiff.
Cited in support of this contention is Huberwald v. Orleans R. Co., 1898, 50 La.Ann. 477, 23 So. 474, which indeed held that the action for wrongful death given to a minor child by Article 2315 was extinguished when that child attained the age of majority before instituting the action. This holding was based upon the conception that the legislative purpose of allowing an action to survive in his favor was solely to obtain relief for the needs of the minor child during his minority. 50 La.Ann. 479-480, 23 So. 475-476. See also Eichorn v. New Orleans & C.R., Light & Power Co., 1905, 114 La. 712, 724, 38 So. 526. For at that time LSA-Civil Code, Article 2315, as then most recently amended by Act 71 of 1884, pertinently provided only that the right of an action for damages should survive in case of death "in favor of the Minor children or widow of the deceased, or either of them", and there was no statutory provision for survival of such actions in favor of major children.
However, LSA-Civil Code, Article 2315 was broadened by Act 120 of 1908 so as to provide for the survival of tort actions in case of death "in favor of the Children or widow of the deceased or either of them" (although there was the proviso that "the right of action shall accrue to the major children only in those cases where there is no surviving widow or minor child or children"), and it retained in substance these provisions through its subsequent broadening amendments, the most recent prior to the present death and litigation being by Act 333 of 1948.
Subsequently, in a decision not directly relating however to the present question, the Supreme Court held that the status of plaintiffs as survivor-beneficiaries under LSA-Civil Code, Article 2315 is determined at the time of the death and not at the time of the suit. Kerner v. Trans-Mississippi Terminal R. Co., 1925, 158 La. 853, 104 So. 740. Cf. also, Brock v. Friend, 1925, 4 La.App. 723, where our court held that a decedent's widow was entitled to recover damages for his wrongful death as his widow, even though at the time she instituted suit therefor she had remarried and was the wife of another man.
And so, conceding that the Huberwald case may be authority under the previous wording of LSA-Civil Code, Article 2315 for the legal proposition upon which the defendants-appellants rely, we think that its holding is no longer applicable due to the subsequent legislative amendments and judicial interpretations of LSA-Civil Code, Article 2315, under which the status of Austin McKay as a survivor entitled to recover under this codal article is to be determined as of the time of the decedent's death and not as of the time Austin sought to be substituted as a plaintiff herein. The appellants' exceptions of no right and no cause of action are accordingly overruled.

III.
Concerning the plea of prescription and/or peremption, at the time we granted the *666 rehearing we were of the impression that in the disposition of such plea a different question might be posed as to Austin McKay (who for the first time joined his younger brother and sister in pleadings to be substituted as plaintiffs on October 2, 1958, more than one year following his father's death on June 21, 1957); than for Dolphus McKay, Jr., and Mattie Mae McKay, his younger brother and sister, who had on June 5, 1958 (i. e., within the year following their father's death) filed a "Rule to Show Cause" why they should not be substituted as parties plaintiff. However, at the oral argument the able counsel for the defendants-appellants conceded that if the pleadings filed by these latter two plaintiffs on June 5, 1958 had prevented the accrual of prescription and/or peremption, then that Austin's right to be substituted as a survivor had also been preserved by the timely action of his co-beneficiaries.
The question of any different prescription and/or peremption applicable to Austin McKay than to his co-plaintiffs arising out of the above circumstances is therefore not before us.
Even though the "rule to show cause" on behalf of the minors Dolphus McKay, Jr. and Mattie Mae McKay (which prayed that they be substituted as parties plaintiff) was filed within a year of the original plaintiff's death, able counsel for the defendants-appellants contends that it cannot be held to have preserved their right to be substituted as parties plaintiff because: (1) this pleading was dismissed upon the defendants-appellants' exceptions of no right and of no cause of action; and (2) the one year period under LSA-Civil Code, Article 2315 is not a prescriptive period which can be interrupted or suspended, but it is rather a peremptive period and therefore "the right conferred [by Article 2315] is a purely personal one, which, if not reduced to possession dies or expires at the end of one year after the death of the injured party," Miller v. American Mut. Liability Ins. Co., above-cited, at 42 So.2d 331 (italics ours).
The words italicized in the quotation from the Miller case are, however, obiter dicta; for in the Miller case both the filing of pleadings praying for substitution and the order permitting it were filed after the year from the decedent's death had expired. This was also the factual situation in Lally v. Taylor, La.App.Orl., 117 So.2d 602, the other case relied upon by the defendants-appellants in support of its contention that timely substitution had not been made. Neither of these decisions, therefore, are necessarily applicable to the decision of the present question, where within the year of the decedent's death pleadings for substitution had been filed.
In our opinion, the plaintiffs' rights under LSA-C.C. Article 2315 to be substituted for the deceased original tort-plaintiff were not extinguished by prescription and/or peremption, because within the requisite year pleadings were filed which (although imperfectly styled and imperfect in statement) fairly apprised the defendants of the right of the two named minors to be substituted for the decedent. Callendar v. Marks, 185 La. 948, 171 So. 86; Reeves v. Globe Indemnity Company, 185 La. 42, 168 So. 488; Kansas City Fire & Marine Ins. Co. v. Hillman, La.App. 1 Cir., 118 So.2d 174; Angelette v. Hardie, La.App.Orl., 70 So.2d 196, 197; Reynolds Metal Co. v. T. L. James & Co., La.App.Orl., 69 So.2d 630; Smith v. Monroe Grocery Co., La.App. 2 Cir., 171 So. 167. As these cases hold, in such circumstances, even though the timely-filed initial proceedings are subject to dismissal due to imperfection in pleading, the court should properly permit an amendment thereof to supply the deficiencies (as did the trial court in the present instance), which amendment relates back to the date that the original pleadings were filed, for purposes of deciding whether a cause of action arising under LSA-C.C. Art. 2315 was filed within the peremptive *667 year. See also Jackson v. American Employers' Ins. Co., 202 La. 23, 11 So.2d 225.
In summary, the right of the minors Dolphus McKay, Jr., and Mattie Mae McKay to be substituted as parties plaintiff for their father who had died on June 21, 1957 was clearly sought by the proceedings filed on June 5, 1958. Although these pleadings were defective as to form and allegations and were therefore dismissed on exceptions, the trial court properly at the same time reserved the right of the plaintiffs to amend such proceedings. The substitution of the minors on October 2, 1958, pursuant to such reservation of the right to amend, relates back to the filing of the initial proceedings on June 4, within the prescriptive year, so that the minors' rights to be substituted was not extinguished by peremption or prescription.
Counsel for the appellant further urges that, not only the motion to substitute must be filed timely, but also the order permitting the substitution must be filed within the year. We can find no statutory authority to justify this contention. Neither the unavailability or unwillingness of a district judge to sign the order of substitution within the final days of the peremptive period, nor any skillful dilatory tactics of opposing counsel preventing a timely signature of the order, can irretrievably defeat the right of minors or others to be substituted as parties plaintiff to continue the prosecution of a suit timely brought by their decedent, when such survivors timely file proceedings seeking to be substituted for the decedent as plaintiff(s).
For the foregoing reasons, the defendants-appellants' pleas of prescription and/or peremption are also overruled.
For the reasons assigned, our original decision herein is reinstated.
NOTES
[1] This is demonstrated in part, but quite convincingly, by the testimony of Mr. Bankston himself. In response to plaintiffs' counsel's question: "You were going pretty slow when you made this turn, weren't you?", Mr. Bankston, an elderly gentleman, replied: "I was. I alwayswell, really, I drive slow and I turn slow when I go to turn off. I don't go like some of the young fellows does, like the devil was after me." He stated further on direct examination as to how the accident occurred:

"Q. Will you explain to the Court just how that accident happened? A. Well, I was coming south, wanted to turn east at the crossing there at Tangipahoa, and I saw a car coming meeting me, coming north. The car, I would saywell, it wasany of you that knows the location of things there, it was right close to the milk plant. Now, it's 60 yards or more from the crossing and I felt sure had lots of time to make my turn and be clear of the highway, to be clear of that lane of the road, but the speed the other car was coming at it caught me in his lane of the road. I admit that it caught me in his lane of the road and, of course, I had just started to make my turn and he struck the right fender of my car with the right side of his car."
* * * * *
"Q. Now, show where the darky's car was. A. The darky was coming up here and he caught me right here, the right side of my car and the right side of hiswell, maybe I better not say, I believe the darky testified I was stopped and standing still when he hit me, is that right?
"Q. You just tell what you know, just tell what happened. A. Well, when I seen the darkyI'm not very quick on thinking, I don't reckon, but when I seen, or I told and testified yesterday that I was driving slow, when I seen I could not avoid an accident and seen that he was going to hit me I slowedit just flashed through my mind that he was just headed right in for the right front door of my car, and I slowed upit just flashed through my mind that I would rather risk * * *
"Q. Well, tell just where it happened, Mr. Bankston, Show right where the impact was.
"Mr. Palmer. Your Honor, I believe he ought to be able to explain what went through his mind at the time. A. Right here, right here is where it happened, but as I said, Mr. Richardson, I would rather riskI was in a heavy car, a pretty good carand I would rather risk the bumper and fender thanmy wife was sitting right by this door right there, right up against the door my side."
[1] LSA-Civil Code, Article 2315 has subsequently been amended by Act 30 of 1960, so as no longer to differentiate in this respect between major and minor children. The amended article will not, however become effective until January 1, 1961. Section 3, Act 30 of 1960.